ARMOUR PACKING COMPANY *v.* UNITED STATES.

SWIFT AND COMPANY *v.* SAME.

MORRIS AND COMPANY *v.* SAME.

CUDAHY PACKING COMPANY *v.* SAME.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 467, 468, 469, 470. Argued January 20, 21, 22, 1908.—Decided March 16, 1908.

A device to obtain rebates to be within the prohibition of the Interstate Commerce Act of March 2, 1889, 25 Stat. 857, and the Elkins Act of February 19, 1903, 32 Stat. 847, need not necessarily be fraudulent. The term "device" as used in those statutes includes any plan or contrivance whereby merchandise is transported for less than the published rate, or any other advantage is given to, or discrimination practiced in favor of, the shipper.

In construing the Elkins Act it will be read not only in the light of the previous legislation on the same subject, but also of the purpose which Congress had in mind in enacting it—to require all shippers to be treated alike and to pay one rate as established, published and posted. *New Haven Railroad Co.* v. *Interstate Commerce Commission,* 200 U. S. 361, 391.

The requirements of § 2 of Art. III of, and of the Sixth Amendment to, the Federal Constitution relate to the locality of the offense and not to the personal presence of the offender.

Transportation of merchandise by a carrier for less than the published rate is, under the Elkins Act, a single continuing offense, continuously committed in each district through which the transportation is conducted at the prohibited rate, and is not a series of separate offenses, and the provision in the law making such an offense triable in any of those districts, confers jurisdiction on the court therein, and does not violate § 2 of Art. III of, or the Sixth Amendment to, the Federal Constitution, providing that the accused shall be tried in the State and district where the crime was committed.

The Interstate Commerce Act embraces the whole field of interstate commerce; it does not exempt such foreign commerce as is carried on a through bill of lading, but in terms applies to the transportation of property shipped from any place in the United States to a foreign country and carried from such place to a port of transhipment.

The export and preference clause of the Constitution prohibits burdens only by way of actual taxation and duty, or legislation intending to give, and actually giving, the prohibited preference, and does not prohibit the merely incidental effect of regulations of interstate commerce wholly within the power of Congress; and the fact that such regulations in the Interstate Commerce Act may affect the ports of one State having natural advantages more than those of another State not possessing such advantages does not render the act unconstitutional as violating that provision.

There is no provision in the Elkins Act exempting special contracts from its operation, nor is there any provision for filing and publishing such contracts, and the fact that a contract was at the published rate when made does not legalize it after the carrier has advanced the published rate. The provisions as to rates, being in force in a constitutional act of Congress when the contract is made, are read into the contract and become a part thereof, and the shipper, who is a party to such a contract, takes it subject to any change thereafter made in the rate to which he must conform or suffer the penalty fixed by law.

An indictment which clearly and distinctly charges each and every element of the offense intended to be charged, and which distinctly advises the defendant of what he is to meet at the trial is sufficient; and so *held* in this case as to an indictment for accepting rebates prohibited by the Elkins Act, although the details of the device by which the rebates were received were not set out.

While intent is to some extent essential in the commission of crime, and

without determining whether a shipper honestly paying a reduced rate in the belief that it is the published rate is liable under the statute, *held* that shippers who pay such a rate with full knowledge of the published rates, and contend that they have a right so to do, commit the offense prohibited by the Elkins Act, and are subject to the penalties provided therein, even though their contention be a mistake of law.
153 Fed. Rep. 1, affirmed.

THE facts are stated in the opinion.

*Mr. Frank Hagerman* and *Mr. J. C. Cowin*, with whom *Mr. A. R. Urion, Mr. Henry Veeder* and *Mr. M. W. Borders* were on the brief, for petitioners:

A shipper can be guilty of an offense under the Elkins Act only if and when he is guilty of some bad faith or fraudulent conduct in using some kind of device intentionally dishonest or some underhand method of obtaining a rebate, concession or discrimination. It was never intended that he should be held guilty if he honestly believed he was entitled to the rate at which he openly shipped.

The purpose of the Elkins Act was to enlarge the character of devices specified in the act of 1889, and it should have read into it the language of the act of 1889 by making willfulness and knowledge essential elements. Otherwise the statute is incomplete and to be sustained at all must be read in the light of the common law, leaving the court to infer that the legislative intent was only to create guilt on the part of the shipper if he knew of the published tariff and then by some device obtained a concession thereunder. See *United States* v. *Carll*, 105 U. S. 611; *United States* v. *Milwaukee Refrigerator Transit Co.*, 142 Fed. Rep. 247, 251, 252.

The word "device" cannot be taken from the statute, for it is a word of well-defined legal meaning, the trial judge having adopted that given by Webster. See A. & E. Enc. Law (2d ed.), 448; 1 Bouvier's Law Dictionary (Rawle's Revision); Black's Law Dictionary; *Potter* v. *State*, 27 Arkansas, 362; *State* v. *Blackstone*, 115 Missouri, 427.

Not only was it necessary for the shipper to use some device,

but he must have known what the tariff was and used the device to evade it. An innocent shipper paying a rate called for is guiltless, even though the tariff is not charged. *Pond-Decker Lumber Co.* v. *Spencer,* 30 C. C. A. 430; *S. C.,* 86 Fed. Rep. 846, 848; *United States* v. *Milwaukee Ref. Transit Co.,* 142 Fed. Rep. 247, 252.

There was no jurisdiction, because the alleged crime was not committed within the district, nor any concession made as to any portion of the route therein.

The indictment only charged, and the proof conclusively showed, that the alleged concession was obtained in Kansas upon that portion of the transportation which was conducted east of the Mississippi River. So far as concerned the Western District of Missouri, the shipment was merely carried through it by the railway company.

If the Elkins Act is to be construed to authorize a prosecution of the shipper outside of the district in which the concession was obtained, it is unconstitutional under § 2, Art. III and the Sixth Amendment of the Federal Constitution. *Tinsley* v. *Treat,* 205 U. S. 20. So it was decided as to the act of 1889, 32 Stat. 847, prohibiting shippers from obtaining concessions, *In re Belknap,* 96 Fed. Rep. 614, 616; *Davis* v. *United States,* 104 Fed. Rep. 136, 138; as to the act of 1887, 24 Stat. 379, 382, prohibiting the giving of rebates, *United States* v. *Fowkes,* 53 Fed. Rep. 13, 16; and as to the anti-lottery act, § 3894, Rev. Stat., as amended, 26 Stat. 465, in so far as it attempted to authorize a prosecution in a district to which the matter was mailed, where the offense charged was depositing the matter in the mail, see *United States* v. *Conrad,* 59 Fed. Rep. 458, 465.

The Elkins Act, so far as it attempts to authorize a prosecution in any district through which the transportation is conducted, should not in any event be held to apply, as against a shipper who committed no act within the district, especially when the alleged concession was not upon any part of the route therein.

The offense, if any was committed by the shipper, was com-

plete in Kansas. See *Dealy* v. *United States*, 152 U. S. 539; *In re Belknap*, 96 Fed. Rep. 614, 616, 617; *Davis* v. *United States*, 43 C. C. A. 448; *S. C.*, 104 Fed. Rep. 136, 138, 139; *United States* v. *Fowkes*, 3 C. C. A. 394; *S. C.*, 53 Fed. Rep. 13, 16, 17.

The purpose of § 2, Art. III, of the Constitution, and the Sixth Amendment, was to give to defendant the benefit of an indictment by, and a trial before, a jury of his neighbors, or of the community in which the offense was committed, and to protect him against a trial "as a stranger in a strange land" where he had never been and in which he had committed no act. *Tinsley* v. *Treat*, 205 U. S. 20; *Beavers* v. *Henkel*, 194 U. S. 73, 83; *Thompson* v. *Utah*, 170 U. S. 343, 349, 350; *West* v. *Gammon*, 39 C. C. A. 271; *Burton* v. *United States*, 196 U. S. 283, 304.

The shipment being a through export shipment, was not within the Elkins Act, which is limited to "the interstate or foreign commerce" provided for in the original Interstate Commerce Act, 24 Stat. 379, and amendments thereto, 25 Stat. 855. Its terms have no application to a through export shipment and as such shipments are excluded from the scope of the act, § 6, requiring the publication of schedules, can have no application thereto.

The act covers only rail carriers, or those with a combined rail and water (inland) route. Independent inland water carriers are not included, nor water carriers under a common arrangement with each other for continuous shipment. With broadest interpretation of phrase, "common control," etc., it is only water (inland) carriers that make joint rates with a rail carrier that come within the act. All other carriers are excluded, wagon, express, telegraph, etc. Ocean carriers, whether acting independently or making common arrangement with rail carriers, are outside the act; because they do not carry the kind of commerce that is regulated by the act, that is, foreign commerce while it is outside port of transhipment or entry; nor do they come under description of carriers regulated.

The act as construed by the Circuit Court of Appeals is in

conflict with Art. I, § 9, par. 5 of the Constitution, which prohibits the laying of any tax or duty on articles exported from any State or the giving of any preference by any regulation of commerce or revenue to the ports of one State over those of another. This prohibition upon exported articles is a guaranty against any form of legislation which burdens exportation. *Fairbank* v. *United States,* 181 U. S. 283.

The act as construed also violates that portion of the section which prohibits any preference to the ports of one State over those of another, as it gives a distinct preference to those ports which are reached by water as against those which are reached only by land. See *Passenger Cases,* 7 How. 284, 420; *Ward* v. *Maryland,* 12 Wall. 418; *Fairbank* v. *United States,* 181 U. S. 283, 294.

The contract of the shippers with the Burlington Company was a valid one. A carrier can make a contract to carry for a fixed period at the then published rates, and such a contract is not subject to the right of the carrier, voluntarily and without the shipper's consent, to change it at any time, upon giving the statutory notice, by an amendment of the tariff. The right to make a change in the tariff is a privilege given to the carrier which it can waive. While it can make no contract that is not subject to a change in the rate by Congress or by finding of the Interstate Commerce Commission, it can for itself agree to carry for a given time at an existing published rate. See packing house contract case (*Interstate Commerce Commission* v. *C. G. W. Ry. Co.,* 141 Fed. Rep. 1003); special milk shipper's contract (*D., L. & W. R. Co.,* 147 Fed. Rep. 51, 61; certiorari denied, 203 U. S. 588). The statute does not in terms interfere with the contractual right of the carrier.

Without prohibition by a statute, such a contract is undoubtedly valid. *Cin. &c. R. R. Co.* v. *Interstate Com. Commission,* 162 U. S. 184; *Pond-Decker Lumber Co.* v. *Spencer,* 30 C. C. A. 430; *S. C.,* 86 Fed. Rep. 846, 848; 4 Elliott on Railroads, § 1560; *Memphis & C. Packet Co.* v. *Abell,* 17 Ky. Law Rep. 191; *S. C.,* 30 S. W. Rep. 658, 659; *Baldwin* v. *Liverpool & G. W.*

*Ry. Co.*, 48 Hun, 496, 500; *Chicago &c. R. Co.* v. *Chicago &c. Coal Co.*, 79 Illinois, 121, 126; *Atlanta, K. & N. R. Co.* v. *Horne*, 106 Tennessee, 73; *S. C.*, 59 S. W. Rep. 134, 135.

Having made the contract in accordance with the schedule, it was the duty of the carrier to keep such schedule in force and to carry for all others at the same rate. Hence, there was no right to change the tariff during the life of the contract. Such was the effect of the contract. *Laurel Cotton Mills* v. *Gulf &c. R. Co.*, 84 Mississippi, 339.

The indictment was insufficient. The indictment omitted the statutory words, "whereby . . . property . . . *by any device* : . . . be transported at a less rate. . . ." Not only this, but it wholly failed to state how, in what manner, or by what means the concession was obtained, or of what it consisted. In a statutory offense, there cannot be any omission of any element of the offense as defined; and, the indictment must show the means by or the manner in which the offense was committed. Even in statutory offenses of the character in question, there is an exception to the general rule that it is sufficient to charge the offense in the language of the statute. *United States* v. *Cook*, 17 Wall. 168; *United States* v. *Cruikshank*, 92 U. S. 542; *United States* v. *Mann*, 95 U. S. 583; *United States* v. *Hess*, 124 U. S. 483; *Evans* v. *United States*, 153 U. S. 584; *United States* v. *Brazean*, 78 Fed. Rep. 464, 465, and cases cited; *Evans* v. *United States*, 153 U. S. 584; *Keck* v. *United States*, 172 U. S. 434; *United States* v. *Britton*, 107 U. S. 655, 669.

The facts did not warrant a finding of any criminal guilt. Nothing in the record warrants any imputation of bad faith.

It can well be contended that the element of willfulness in the former law must be extended to the Elkins Act. Another principle leads to exactly the same result. In the Federal courts even if a statute does not use the words "willfully or intentionally" or make *scienter* necessary, still the statute will be construed to mean that there must have been knowledge of wrongdoing and actual guilty intent, unless, possibly,

in cases where a specific act is unconditionally made an offense. So where the offense is uttering forged paper, *United States* v. *Carll,* 105 U. S. 611; obstructing justice, *Pettibone* v. *United States,* 148 U. S. 197; mailing obscene matter, *United States* v. *Slenker,* 32 Fed. Rep. 691, 694; obstructing Federal election officers, *United States* v. *Taylor,* 57 Fed. Rep. 391; adopting device prohibited by the Elkins Act, *United States* v. *Milwaukee Transit Co.,* 142 Fed. Rep. 247, 252. This is a recognition of the general rule that criminality will not be imputed unless an act is done in bad faith, or with an intention of violating the law.

The *Attorney General, Mr. Milton D. Purdy,* Assistant to the Attorney General, and *Mr. A. S. Van Valkenburgh,* United States Attorney, for the United States:

The acts of the shippers in these cases in accepting and receiving a special rate or discrimination, whereby their goods were carried at a less rate than that charged others for the same service, constitutes a crime under the Elkins Act without regard to whether there was any secret device employed by them to obtain from the railroad company the concession of such rebate, special rate or discrimination. The history of the prior acts *in pari materia,* as well as of the Elkins Act itself, shows this to be so. *United States* v. *Tozer,* 37 Fed. Rep. 635; *United States* v. *Standard Oil Co.,* 148 Fed. Rep. 719; *New York, New Haven & Hartford R. R. Co.* v. *Interstate Commerce Commission,* 200 U. S. 361; *Harris* v. *Rosenberger,* 145 Fed. Rep. 449; *Durland* v. *United States,* 161 U. S. 306.

The court had jurisdiction of the alleged crime for the reason that the transportation was conducted through the district, and the transportation of the property is an essential element of the offense. The offense of giving or receiving rebates is susceptible of prosecution whenever the transportation has started by the delivery of the property to the carrier, and continues and is ever present until that transportation is completed. *Rhodes* v. *Iowa,* 170 U. S. 412; *Heyman* v. *Southern*

*Ry. Co.*, 203 U. S. 270; *United States* v. *Fowkes*, 53 Fed. Rep. 13; *In re Belknap*, 96 Fed. Rep. 614; *State* v. *Smith*, 66 Missouri, 61; *State* v. *McGraw*, 87 Missouri, 161; *State* v. *Hatch*, 91 Missouri, 568; *Commonwealth* v. *Parker*, 165 Massachusetts, 526; *State* v. *Bailey*, 50 Ohio St. 636; *Commonwealth* v. *Macloon*, 101 Massachusetts, 1, 6.

In export shipments, the Elkins Act applies to interstate inland carriage from the point of origin within the United States to the port of transhipment. The Interstate Commerce Act (§ 1) plainly applies to commerce with a country *not* adjacent. It places that commerce entirely within the operation of the act, whether the same is between the point of origin and the port of transhipment or between the port of entry and the point of destination. *Texas & Pacific R. Co.* v. *Interstate Commerce Commission*, 162 U. S. 197.

This act was designed primarily in the case of export shipments for the protection of the shipper; no one shipper, but shippers in the aggregate. Take away the necessity of published rates and of adherence to published rates, and there is little to prevent the carrier, by a complex and devious system of rate-making, from discriminating between various shippers similarly situated from the point of origin to the port of transhipment, and of so skillfully concealing or excusing the same that punishment in any given case would be well-nigh impossible. This, Congress foresaw, and in order to prevent this greater evil it passed a law, which may possibly, as is the case with all laws conferring general benefits, work some temporary inconvenience in isolated cases.

In any event, the discretion was with Congress, and with Congress alone, and the courts cannot do otherwise than enforce the plain provisions of the legislative act. *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 477 *et seq.; Interstate Commerce Commission* v. *Baltimore &c. R. Co.*, 145 U. S. 263.

The act in question here is not unconstitutional as burdening export traffic nor as giving preference to the ports of one State over those of another. If it at all affects the traffic of any port

injuriously it is purely incidental and does not come within the constitutional prohibition. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 434; *South Carolina* v. *Georgia*, 93 U. S. 13; *Cooley* v. *Board of Port Wardens*, 12 How. 299; *Norris* v. *Boston*, 7 How. 414; *United States* v. *Wood*, 145 Fed. Rep. 412;.

The contract between the Burlington company and the packers, even if valid as between carrier and shipper after August 7, 1905, cannot avail either carrier or shipper as a defense to a departure from the filed and published rate in force after that date.

Since the passage of the Elkins amendment the shipper is liable equally with the carrier for a departure from the filed and published rate, and the mere soliciting, accepting, or receiving of a concession or rebate is an offense. No intent is necessary to the completion of that offense. Where the intent is not essential, a mistake or ignorance of fact is quite as immaterial as mistake or ignorance of law. *United States* v. *Leathers*, 6 Sawyer, 17; *State* v. *Griffith*, 67 Missouri, 287; *Beckham* v. *Nacke*, 56 Missouri, 546; *People* v. *Roby*, 52 Michigan, 577; *Church* v. *Minneapolis & St. L. Ry. Co.*, 14 S. Dak. 443.

The law stood upon the statute books when this contract was made. Both parties contracted with reference to it, and what subsequently might be done under it, even to the extent, as has been held, that the law itself might be changed, because the power to regulate and legislate respecting such commerce is reserved in Congress. *Fitzgerald* v. *Grand Trunk Ry. Co.*, 63 Vermont, 173; *McGowan* v. *Wilmington*, 95 N. Car. 417; *Clarendon* v. *Rutland &c. Ry. Co.*, 75 Vermont, 6; *St. Anthony* v. *St. Paul Water Co.*, 168 U. S. 372.

The indictments in these cases are sufficient. The employment of a device is not an essential element of the offense, and with respect to the concession charged, the indictment fully and sufficiently described it, what it was and of what it consisted. *United States* v. *Britton*, 107 U. S. 655 (cited by petitioners), discussed and distinguished. The charge in the in-

dictment fully meets all legal requirements. *United States* v. *Simmons*, 96 U. S. 360, 362. And see *Connors* v. *United States*, 158 U. S. 408, 411; *Ledbetter* v. *United States*, 170 U. S. 606, 611.

The facts fully warrant the finding of criminal guilt. The packers are conclusively presumed to have intended to do what they did and are bound by the legal consequences of their acts. *New Haven R. R. Co.* v. *Interstate Commerce Commission*, 200 U. S. 361, 396–398.

MR. JUSTICE DAY delivered the opinion of the court.

These cases are here upon writs of certiorari to the United States Circuit Court of Appeals for the Eighth Circuit. By stipulation there was a single petition for certiorari and the cases in the Circuit Court of Appeals were considered together on the record in the *Armour Packing Company case*, and, as it is conceded in the brief of the learned counsel for the petitioners that the differences in the cases are unsubstantial, the same course may be followed here.

Each of the petitioners was convicted in the District Court of the United States, Western District of Missouri, for violation of the so-called Elkins Act of February 19, 1903, chap. 708, 32 Stat. 847, in obtaining from the Chicago, Burlington and Quincy Railway Company an unlawful concession of 12 cents per 100 pounds from the published and filed rate on that portion of the route between the Mississippi River and New York for transportation upon a shipment made August 17, 1905, for carriage by rail of certain packing house products from Kansas City, Kansas, to New York for export. Upon writs of error from the Circuit Court of Appeals of the Eighth Circuit the sentences of conviction were affirmed. 153 Fed. Rep. 1.

The facts in the *Armour case* are briefly these: From May 9 to August 6, 1905, the Chicago, Burlington and Quincy Railway Company, with its connecting railroads east of the Mississippi River, under joint traffic arrangements, had filed, published and posted in accordance with the acts of Congress the

rates of shipment of the character in question, and showing that the proportionate part thereof from points on the Mississippi River to New York was 23 cents per 100 pounds. Upon June 16, 1905, the packing company contracted with the Wilson Steamship line for space upon boats sailing in August for certain shipments, and notified the Burlington Company thereof, giving it a copy of the contract. On June 17, 1905, the Burlington Company contracted with the packing company to carry export shipments from Kansas City, Kansas, of products named, until December 31, 1905, at a rate the proportionate part of which from the Mississippi River to New York city was 23 cents per 100 pounds as aforesaid. Upon August 6, 1905, the tariff was amended and duly published and filed, showing that the proportionate part from the Mississippi River to New York city was 35 cents instead of 23 cents per 100 pounds. One of the connecting railroads then objected to the carrying of the freight at the contract rate hereinbefore stated, and a controversy arose between it and the Burlington Company as to whether such contract should apply, the Burlington Company claiming that it should, the connecting carrier denying this contention. Upon August 17, 1905, the packing company delivered at Kansas City, Kansas, to the Burlington Company sixty-seven tierces of oleo oil, property of the character covered by the contract, for export to Christiania, Norway, and upon receipt thereof at Kansas City, Kansas, the Burlington Company issued and delivered a bill of lading agreeing to carry the same to the point of destination for a through rate, which included the carriage by, and the rate of the steamship line, which bill of lading was, according to the ordinary course of business, delivered to the Traders Despatch, one of the connecting carriers, which took the same up and issued a through bill of lading for the goods at the through rate. The bill was in triplicate, one copy thereof being delivered to and accepted by the steamship company. The packing company paid to the Burlington Company, as the initial carrier, the full through rate for the

carriage over the line of the Burlington Company and its connecting carriers and that of the steamship line, and from the time of the delivery of the freight to the railway company at Kansas City, Kansas, until it was delivered at the export destination, it was exclusively handled by the carriers, rail and steamship, the shipper having nothing to do with it. The Burlington Company did, with connecting lines, transport the property from Kansas City, Kansas, through the Western District of Missouri and other States and districts to New York city, where the same was delivered to the steamship line. The full rate for the through carriage thus paid was made up so that the proportional part of the railroad carriage east of the Mississippi River was 23 cents per 100 pounds, instead of 35 cents per 100 pounds, fixed by the amended and published rate. The packing company at the time of making the shipment and paying the freight knew of the filing and publishing of the amended tariff of August 5, 1905, but did not know how the rate was apportioned or divided, or made up among the respective carriers or points, except that it knew the steamship rate as named in the contract with the steamship owners.

At the time aforesaid the Burlington Company was a common carrier, engaged in the transportation of property by railway under contract agreements and traffic arrangements with certain other lines, extending from Kansas City, Kansas, east to the city of New York and other seaboard points. There were no fixed contract, agreements or traffic arrangements with the steamship lines, which were conducted as hereinafter set forth. The ocean rate is variable, depending upon the season, weather and other matters. The steamship must sail at a given date and has a certain amount of space to be filled, so that space may be at one time quoted to one person at one price and at another time to another person at a different price. The question of such rates vary from hour to hour, as well as from day to day. For these, among other reasons, there was no contract agreement or traffic arrangements between the railroads and export steamship lines. The reservation of

space upon an ocean steamer in advance is an important thing, so that the packing company can be certain that its shipment can go on the boats sailing at specified times. The packing company has houses in different parts of the United States, so that it cannot always at the time of the contract for space know from what particular point and over what road the shipments will go.

Before August 6, 1905, shipments were made according to the terms of the contract aforesaid, which were carried under the terms thereof. The Armour Company contended and insisted that the amendment increasing the tariff rate did not and could not abrogate or impair the term of its contract.

These prosecutions were under the Elkins Act (32 Stat. 847), and the first question argued concerns the construction of that act, as to what constitutes a crime on the part of the shippers so far as obtaining a shipment by some manner of device is concerned, it being the contention of the petitioners that in order to work conviction the shipper must be guilty of some bad faith or fraudulent conduct in the use of the device or obtain the rebate by some intentionally dishonest or underhanded method, concession or discrimination denounced by the act. The history of the act in this feature may be of service in interpreting the meaning of Congress. The act of February 4, 1887, made no provision for criminal offenses against the shippers, but it was provided (§ 2, ch. 104, 24 Stat. 379) that if the common carrier should directly or indirectly, by any special rate, rebate, or other device, demand, collect or receive, through any person or persons, a greater or less compensation for any service rendered or to be rendered in the transportation of property subject to the provisions of the act, than it charges, demands, collects or receives, etc., from any other person or persons for doing for him or them a like service in the transportation of a like kind of traffic under substantially the same circumstances, such common carrier shall be deemed guilty of unjust discrimination, which by the

act was prohibited and made unlawful. And it was made unlawful for a common carrier to deviate from the published schedule of rates, fares and charges. 24 Stat, § 6, p. 381, ch. 104, February 4, 1887.

By the act of March 2, 1889 (25 Stat. 857, § 10), the shipper was brought within certain criminal provisions of the law, and one who should knowingly and willfully, by false billing, false classifying, false weighing, false representation of the contents of the package, or false report of weight, or by any other device or means, with or without the consent or connivance of the carrier, obtain or dispose of property at less than the regular rate established and in force, should be deemed guilty of fraud.

It will be noticed that in these statutes the term device is associated with other words indicative of its meaning, and in the act of March 2, 1889, the shipper, for falsely acting as to weighing, billing, classifying or obtaining the transportation of property at less than the regular rate, or by any other device, was deemed guilty of fraud. In this act the term device, as one of the means of consummating a fraud, shows the sense in which the term is used by Congress. It was only fraudulent conduct in obtaining transportation at less rates than others, which was denounced by the act, and the imposition aimed at was principally such as might be practiced by the shippers upon the carriers in order to procure the preference.

When we come to the Elkins Act we find the following provisions (32 Stat. 847):

"The willful failure upon the part of any carrier subject to said acts to file and publish the tariffs or rates and charges as required by said acts or strictly to observe such tariffs until changed according to law, shall be a misdemeanor, and upon conviction thereof the corporation offending shall be subject to a fine not less than one thousand dollars nor more than twenty thousand dollars for each offense; and it shall be unlawful for any person, persons or corporation to offer, grant or give or to solicit, accept or receive any rebate, concession or

discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. Every person or corporation who shall offer, grant, or give or solicit, accept or receive any such rebates, concessions, or discriminations shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars."

In this act we find punishment by imprisonment abolished, and the shipper and carrier are placed upon the like footing, and it is made unlawful for any person or corporation to offer, grant, solicit, give, or to accept or receive, any rebate, concession or discrimination in respect to transportation of property in interstate or foreign commerce, whereby any such property shall, by any device whatever, be transported for a less rate than that published and filed by such carriers, or whereby any other advantage is given or discrimination practiced. And we find the word device disassociated from any such words as fraudulent conduct, scheme or contrivance, but the act seeks to reach all means and methods by which the unlawful preference of rebate, concession or discrimination is offered, granted, given or received. Had it been the intention of Congress to limit the obtaining of such preferences to fraudulent schemes or devices, or to those operating only by dishonest, underhanded methods, it would have been easy to have so provided in words that would be unmistakable in their meaning. A device need not be necessarily fraudulent; the term includes anything which is a plan or contrivance. Webster defines it to be "that which is devised or formed by design; a contrivance; an invention; a project," etc.

This act is not only to be read in the light of the previous legislation, but the purpose which Congress evidently had in mind in the passage of the law is also to be considered.

The views of this court, speaking through Mr. Justice White, in *N. Y., New Haven & Hartford R. R. Co.* v. *Interstate Commerce Commission*, 200 U. S. 361, 391, are apposite here:

"It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences, and all other forms of undue discrimination. To this extent and for these purposes the statute was remedial and is, therefore, entitled to receive that interpretation which reasonably accomplishes the great public purpose which it was enacted to subserve. . . . The all-embracing prohibition against either directly or indirectly charging less than the published rates shows that the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about. If the public purpose which the statute was intended to accomplish be borne in mind, its meaning becomes, if possible, clearer."

The Elkins Act proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service under the same conditions should be the one established, published and posted as required by law. It is not so much the particular form by which or the motive for which this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates from the fixed rates, duly posted and published.

It is next contended that there is no jurisdiction to prosecute

the offense named, because the alleged offense, if any, was not committed in the Western District of Missouri, where the prosecution was had, but the same was complete in Kansas City in the State of Kansas; and it is contended in this connection that if the act can be construed to include prosecutions in other districts it is unconstitutional within the provisions of the Sixth Amendment of the Constitution of the United States, which provides that the accused shall have the right to be tried by an impartial jury of the State and district wherein the crime shall have been committed. Art. III, § 2, and Amendment VI.

As to the construction of the act, in addition to the section of the act above quoted, it is further provided in the Elkins law (32 Stat. 847) as to jurisdiction:

(Prosecution—Jurisdiction) "Every violation of this section shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed or through which the transportation may have been conducted; and whenever the offense is begun in one jurisdiction and completed in another it may be dealt with, inquired of, tried, determined, and punished in either jurisdiction in the same manner as if the offense had been actually and wholly committed therein."

In this case the indictment charges the actual transportation of the property from Kansas City, Kansas, to New York city, the course of transportation being through the Western District of Missouri, in which the prosecution was had.

We are not now concerned with the construction of the act in making provision for punishing the carrier or shipper for offering, granting or giving, or soliciting, accepting or receiving, rebates, concessions, or discriminations, irrespective of actual transportation, for it is specifically made an offense to receive any rebate or concession *whereby any such property is by any device whatever transported* at a less rate than that named, published and filed by the carrier; and jurisdiction is given to prosecute in any criminal court of the United States

in the district *through which the transportation may have been
conducted.*

Having in view the offense charged in this case, we think
it is clearly within the terms of the act making it penal to
procure the actual transportation, by any of the means de-
nounced in the act, of goods at a less rate than that named
in the tariffs. It is the purpose of the act to punish those who
give or receive transportation, in the sense of actual carriage,
at a concession from the published rates. Wherever such
transportation is received, there the offense is to be deemed
to have been committed. Why may this not be so? In this
feature of the statute, the transportation being of the essence
of the offense, when it takes place, whether in one district or
another, whether at the beginning, at the end, or in the mid-
dle of the journey, it is equally and at all times committed.

Congress also embraced in § 1 of the Elkins Act offenses not
depending upon actual transportation through districts; and
as to the trial of such, it also made provisions in the venue
section.

For the penal section is not only aimed at offenses whereby
property is transported in interstate commerce at less than
published rates, but in terms covers the offering, granting,
giving, soliciting, accepting or receiving of rebates, conces-
sions or discriminations, "whereby any other advantage is
given or discrimination is practiced" in respect of interstate
transportation.

Congress doubtless had in mind that some of these offenses
might be complete in a single district; some might be begun
in one and completed in another; and those wherein transporta-
tion—actual carriage—was made an essential element might
continue through several districts, and hence undertook to
provide places for trial of any offense which might be com-
mitted against the provisions of the act. It is at least certain
that these sections, construed together, make an offense of
obtaining transportation at a concession from the published
rate, which shall be triable in any district through which it

is had. That is the offense of which the accused is charged in this case, and such is the district in which it was tried.

It is contended that the contrary was held in the case of *Davis* v. *United States,* 104 Fed. Rep. 136, decided in the Circuit Court of Appeals for the Sixth Circuit. In that case the prosecution was for false billing by the shipper, under § 10 of the act of 1889, wherein the statute provided punishment for the offense in a single district, and it was there held that the crime was complete in the district in which the false billing was made and the goods delivered to the carrier for transportation, and that its actual carriage was not an essential element of the offense; and that a prosecution in Texas for goods falsely billed and delivered to the carrier in Ohio could not be maintained.

Under the amended act, transportation, with a rebate, or at a concession from the established rates, is made an offense as to the shipper as well as the carrier, thereby differentiating the Elkins Act from § 10 of the act of 1889 as construed in the *Davis case.* In the *Davis case* it was specifically said:

"Such transportation may be through a number of districts, but Congress has given jurisdiction for punishment of the crime in the district in which the offense is committed. It must have been in the contemplation of Congress that the fraudulent representations may be made in one place, and the transportation, in the sense of actual carriage, obtained as a result thereof, may be to a State or district remote from the place of delivery, and through a number of districts of the United States. If it was contemplated that the crime could only be committed when the carriage contracted for was concluded, quite a different provision would have been inserted than the one requiring punishment in the district where committed. Congress, in passing this act, and providing for the place of trial and punishment in a single district, evidently contemplated the consummation of the offense at the place where the goods are billed by the shipper and the delivery for transportation takes place."

But it is said this construction of the act is in violation of the Sixth Amendment of the Constitution of the United States, which requires crimes to be prosecuted and punished in the State or district where the same are committed, and that as the transportation was had, at least, in part in Kansas, the offense was there completed and could not be prosecuted elsewhere. But the constitutional provision does not require the prosecution of the defendant in the district wherein he may reside at the time of the commission of the offense, or where he may happen to be at that time, provided he is prosecuted where the offense is committed. The constitutional requirement is as to the locality of the offense and not the personal presence of the offender. *In re Palliser*, 136 U. S. 257, 265; *Burton* v. *United States*, 202 U. S. 344, 387. This doctrine finds illustration in *Palliser's case*, *supra*, in which a person was prosecuted in Connecticut for mailing a letter in New York, addressed to the postmaster in the former State, to induce him to violate his official duty, and it was therein argued that the offense was complete in New York when the letter was mailed, and that only in the New York district could the prosecution be constitutionally had; but this court, speaking through Mr. Justice Gray, said: "There can be no doubt at all, if any offense was committed in New York, the offense was continuing to be committed when the letter reached the postmaster in Connecticut."

In that case the offender had done no act out of New York and the acts performed by him were complete when the letter was delivered at the post office in that State, but this court held the crime to be a continuing one. We think the doctrine for stronger reason applies in the present case, for transportation is an essential element of the offense, and, as we have said, transportation equally takes place over any and all of the traveled route, and during transportation the crime is being constantly committed. It does not follow from this view of the character of the offense that a single transportation of goods can be made the basis of repeated separate

criminal charges in each of the districts through which the transportation at an illegal rate is had. Take the present case. The charge is of a single, continuous carriage from Kansas City to New York at a concession from the legal rate for the part of the carriage between the Mississippi River and New York of 12 cents for each 100 pounds so transported. This is a single, continuing offense, not a series of offenses, although it is continuously committed in each district through which the transportation is received at the prohibited rate.

To say that this construction may work serious hardship in permitting prosecutions in places distant from the home and remote from the vicinage of the accused is to state an objection to the policy of the law, not to the power of Congress to pass it. *Hyde* v. *Shine*, 199 U. S. 62, 78. But this is a large country, and the offense under consideration is one which may be constantly committed through its length and breadth. This situation arises from modern facilities for transportation and intercommunication in interstate transportation, and considerations of convenience and hardship, while they may appeal to the legislative branch of the Government, will not prevent Congress from exercising its constitutional power in the management and control of interstate commerce. We think there was jurisdiction to prosecute for the offense charged within the Western District of Missouri.

It is further contended by petitioners that the statutes have no application to a shipment on a through bill of lading from an interior point in the United States to a foreign port. It is alleged that the Elkins law refers to the original Interstate Commerce Act, and that its terms do not include such shipments. Analyzing the first section of the act (24 Stat. 379), it is said that it applies to the following kinds of commerce: (*a*) interstate commerce; (*b*) commerce between the United States and an *adjacent* foreign country; (*c*) commerce between places in the United States passing through a foreign country; (*d*) commerce from the United States to a foreign country, only while being transported to a point of transhipment;

(e) commerce from a foreign country to points in the United States, but only while being carried from port of entry either in the United States or an adjacent foreign country. And, it is contended, that § 6, as amended (25 Stat. 855), does not require the filing of through export tariffs.

The purpose of Congress to embrace the whole field of interstate commerce is made apparent by the exclusion only of wholly domestic commerce in the last clause of section one of the original act of 1887, and in the declaration of the scope and purpose of the act declared in its title. *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 197, 211. There is no attempt in the language of the act to exempt such foreign commerce as is carried on a through bill of lading; on the contrary, the act in terms applies to the transportation of property shipped from any place in the United States to a foreign country and carried from such place to a port of transhipment.

What reasonable ground is there for supposing that Congress intended to exercise no control over such commerce if it happens to be billed through to the foreign port? Such construction would place such important commerce shipped in the United States to a port for transhipment abroad wholly outside the restrictions of the law, and enable shippers to withdraw such commerce from the regulations enforced against other interstate commerce by the expedient of a through bill of lading. Take the present case. The through rate is obtained by adding the ocean rate to the inland rate. There is no contractual relation between the railroad carrier and the ocean carrier. The ocean rate is uncertain and variable, depending upon time of sailing and available space. The accommodation for ocean shipment was obtained by the shipper and by it made known to the inland carrier. We think the language of the statute, read in the light of the manifest purpose of its passage, shows the intent of Congress to bring interstate commerce within the control of the provisions of the law up to the time of ocean shipment. This construction

is reinforced by the broad provisions of § 6 of the act as to publishing schedules, showing rates, fares and charges, and filing the same with the Interstate Commerce Commission. That such rates, notwithstanding through bills of lading, were subject to the provisions of the act, was held, upon full consideration, and rightfully, as we think, by the Interstate Commerce Commission. *Re Tariffs* v. *Export and Import Traffic,* 10 I. C. C. Rep. 55.

It is contended that the act, as construed by the Circuit Court of Appeals, makes it conflict with Art. I, § 9, par. 5, of the Constitution, which provides: "No tax or duty shall be laid on articles exported from any State. No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter, clear or pay duties in another."

The petitioner contends that to permit a statute to have such application to articles intended for foreign export is to place a burden on the exercise of this right, because before the shipper can lawfully send his goods abroad and before the carrier can lawfully accept them there must be a compliance with the established rate on file with the Interstate Commerce Commission. This rate is subject only to be changed as provided by law; and this can be done without notice to the exporter and regardless of his power to comply with the legal rate and meet the competition at the seaport and the conditions of foreign markets. These things, it is said place a distinct burden upon export trade, and therefore come within the constitutional prohibition. But it is to be observed that the Constitution provides for a burden only by the way of taxation or duty, and unless the alleged interference amounts to such taxation or duty it does not come within the constitutional prohibition. *Cornell* v. *Coyne,* 192 U. S. 418.

The regulations of interstate commerce provided by the statute now under consideration are within the acknowledged power of Congress under the interstate commerce clause of

the Constitution. There is no attempt to levy duties on goods to be exported, and the mere incidental effect in the legal regulation of interstate commerce upon such exportations does not come within this constitutional prohibition.

Nor do we think there is any more force in the contention that this legislation amounts to a preference of ports of one State over those of another within the meaning of the constitutional provision under consideration. This provision was intended to prevent legislation intended to give and having the effect of giving preference to the ports of one State over those of another State. It may be true that the regulation of interstate commerce by rail has the effect to give an advantage to commerce wholly by water and to ports which can be reached by means of inland navigation, but these are natural advantages and are not created by statutory law. The fact that regulation, within the acknowledged power of Congress to enact, may affect the ports of one State more than those of another cannot be construed as a violation of this constitutional provision. *South Carolina* v. *Georgia*, 93 U. S. 4, 13; *Pennsylvania* v. *Wheeling & Belmont Bridge Company*, 18 How. 421, 433.

It is strongly urged that there is nothing in the acts of Congress regulating interstate commerce which can render illegal the contract between the shipper and the railroad company covering the period from June to December, 1905. The contract, it is insisted, was at the legal, published and filed rate, and there is nothing in the law destroying the right of contract so essential to carrying on business such as the petitioner was engaged in. But this contention loses sight of the central and controlling purpose of the law, which is to require all shippers to be treated alike, and but one rate to be charged for similar carriage of freight, and that the filed and published rate, equally known by and available to every shipper.

In the Elkins Act, Congress has made it a penal offense to give or receive transportation at less than the published rate. This rate can only be raised by ten days' or lowered by three

days' notice. Sec. 6, 25 Stat. 855. There is no provision excepting special contracts from the operation of the law. One rate is to be charged and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. There is no provision for the filing of contracts with shippers and no method of making them public defined in the statute. If the rates are subject to secret alteration by special agreement then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart.

It is said that if the carrier saw fit to change the published rate by contract the effect will be to make the rate available to all other shippers. But the law is not limited to giving equal rates by indirect and uncertain methods. It has provided for the establishing of one rate, to be filed as provided, subject to change as provided, and that rate to be while in force the only legal rate. Any other construction of the statute opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish.

Nor do we find anything in the provisions of the statute inconsistent with this conclusion in the fact that the statute makes the rate as published or filed conclusive on the carrier. The carrier files and publishes the rate. It may well be concluded by its own action. But neither shipper nor carrier may vary from the duly filed and published rate without incurring the penalty of the law.

It may be, as urged by petitioner, that this construction renders impossible the making of contracts for the future delivery of such merchandise as the petitioner deals in, and that the instability of the rate introduces a factor of uncertainty, destructive of contract rights heretofore enjoyed in such property. This feature of the law, it is insisted, puts the shipper in many kinds of trade at the mercy of the carrier, who may arbitrarily change a rate, upon the faith of which

contracts have been entered into. But the right to make such regulations is inherent in the power of Congress to legislate respecting interstate commerce, and such considerations of inconvenience or hardship address themselves to the law-making branch of the Government. *New Haven Railroad Company* v. *Interstate Commerce Commission*, 200 U. S. 399. It may be that such contracts should be recognized, giving stability to rates for limited periods; that the contracts being filed and published, and the rate stipulated known and open to all, no injustice would be done. But, as we have said, such considerations address themselves to Congress, not to the courts. It is the province of the judiciary to enforce laws constitutionally enacted, not to make them to suit their own views of propriety or justice.

The statute being within the constitutional power of Congress, and being in force when the contract was made, is read into the contract and becomes a part of it.

If the shipper sees fit to make a contract covering a definite period for a rate in force at the time he must be taken to have done so subject to the possible change of the published rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law.

The right to charge other than the published rate because of a contract alleged to have provided for the rate in force at the time, but, owing to changed conditions, subsequently becoming inadequate to provide for the payment of the published rate, was dealt with by this court in *New Haven Railroad Co.* v. *Interstate Commerce Commission*, 200 U. S. 361, where a contract for the purchase and carriage of coal at its inception produced the established rate to the carrier, which it subsequently failed to do. This court, speaking through Mr. Justice White, said:

"Further, as the prohibition of the interstate commerce act is ever operative, even if the facts established that at the particular time the contract was made, considering the then cost of coal and other proper items, the net published tariff

rates would have been realized by the Chesapeake and Ohio from the contract, which is not the case, it is apparent that the deliveries under the contract came under the prohibition of the statute whenever for any cause, such as the enhanced cost of coal at the mines, an increase in the cost of the ocean carriage, etc., the gross sum realized was not sufficient to net the Chesapeake and Ohio its published tariff of rates. This must be the case in order to give vitality to the prohibitions of the interstate commerce act against the acceptance at any time by a carrier of less than its published rates. We say this because we think it obvious that such prohibitions would be rendered wholly ineffective by deciding that a carrier may avoid those prohibitions by making a contract for the sale of a commodity stipulating for the payment of a fixed price in the future and thereby acquiring the power during the life of the contract to continue to execute it, although a violation of the act to regulate commerce might arise from doing so."

It is alleged that the indictment is insufficient, in that it fails to set out the kind of device by which traffic was obtained, and of what the concession consisted, and how it was granted. Authorities are cited to the proposition that in statutory offenses every element must be distinctly charged and alleged. This court has frequently had occasion to hold that the accused is entitled to know the nature and cause of the accusation against him, and that a charge must be sufficiently definite to enable him to make his defense and avail himself of the record of conviction or acquittal for his protection against further prosecutions and to inform the court of the facts charged, so that it may decide as to their sufficiency in law to support a conviction, if one be had, and the elements of the offense must be set forth in the indictment with reasonable particularity of time, place and circumstances. And it is true it is not always sufficient to charge statutory offenses in the language of the statutes, and where the offense includes generic terms it is not sufficient that the indictment charge the offense in the same generic terms, but it must state the particulars.

*United States* v. *Hess,* 124 U. S. 483; *Evans* v. *United States,* 153 U. S. 584. But an indictment which distinctly and clearly charges each and every element of the offense intended to be charged, and distinctly advises the defendant of what he is to meet at the trial, is sufficient.

And in *Ledbetter* v. *United States,* 170 U. S. 606, 612, Mr. Justice Brown, speaking for the court, said:

"Notwithstanding the cases above cited from our reports, the general rule still holds good that upon an indictment for a statutory offense the offense may be described in the words of the statute, and it is for the defendant to show that greater particularity is required by reason of the omission from the statute of some element of the offense."

In the present case no objection was made to the indictment until after verdict by motion in arrest of judgment.

Had it been made by demurrer or motion and overruled it would not avail the defendant, in error proceedings, unless it appeared that the substantial rights of the accused were prejudiced by the refusal to require a more specific statement of the particular mode in which the offense charged was committed. See Rev. Stat. U. S. § 1025; *Connors* v. *United States,* 158 U. S. 408, 411.

There can be no doubt that the accused was fully advised of and understood the precise facts which were alleged to be a violation of the statute.

As we interpret this law, it is intended, among other things, to prohibit and punish the receiving of a concession for the transportation of goods from the duly filed and published rate. Each and all of the elements of the offense, with allegations of time, place, kind of goods and name of carrier, are distinctly charged in the indictment, and include the fixing of the published rate at 23 cents per 100 pounds; the changing of the rate and the new publication at 35 cents per 100 pounds; the knowledge of this change on the part of the shipper, and the carriage of the goods over a described route at a concession of the difference between the published and the contract rate—all these

facts being stated, the indictment is clearly sufficient. Whether it was necessary to charge actual knowledge of the change of rate on the shipper's part is a question not involved in this case, as the indictment charges such knowledge, and the facts stipulated show that the shipper knew of the establishing of the new rate when the goods described in the indictment were shipped.

It is again contended that the submission in the trial court of the question of whether there was a device to avoid the operation of the act and to obtain the transportation at the less rate, was prejudicial to the petitioners, as such issue was not within the agreed facts upon which the case was tried.

It is true, as we have held in another part of this opinion, that no device or contrivance, secret or fraudulent in its nature, is requisite to the commission of the offense outlined in the statute, and that any means by which transportation by a concession from the established rate was had is sufficient to work a conviction. Hence this charge was not prejudicial to the petitioner.

It is contended by the petitioner that there is nothing in the facts found in this case to show any intentional violation of the law; that on the contrary the petitioner believed itself to be within its legal rights in insisting upon the performance of its contract, and maintained in good faith that the Interstate Commerce Act did not and could not interfere with it, and that the statute had no application to a shipment of goods for exportation in the manner shown in this case. While intent is in a certain sense essential to the commission of a crime, and in some classes of cases it is necessary to show moral turpitude in order to make out a crime, there is a class of cases within which we think the one under consideration falls, where purposely doing a thing prohibited by statute may amount to an offense, although the act does not involve turpitude or moral wrong. In this case the statutes provide it shall be penal to receive transportation of goods at less than the published rate. Whether shippers who pay a rate under the honest belief that it is the lawfully established rate, when in fact it is not, are

liable under the statute because of a duty resting on them to inform themselves as to the existence of the elements essential to establish a rate as required by law, is a question not decided because not arising on this record. The stipulated facts show that the shippers had knowledge of the rates published and shipped the goods under a contention of their legal right so to do. This was all the knowledge or guilty intent that the act required. 1 Bish. Cr. Law (5th ed.), § 343. A mistake of law as to the right to ship under the contract after the change of rate is unavailing upon well-settled principles. *Reynolds* v. *United States*, 98 U. S. 145.

Finding no error in the judgments of the Circuit Court of Appeals, the same are

*Affirmed.*

MR. JUSTICE MOODY took no part in the disposition of this case.

MR. JUSTICE BREWER dissenting: I dissent from the opinion and judgment in this case, and, without noticing other objections, I rest that dissent upon this single ground: On June 17, 1905, the Burlington Railway Company made a contract with the petitioner, the Armour Packing Company, for the transportation of certain products from Kansas City, Kansas, to New York, this contract to remain in force until December 31, 1905. No objection is made to the reasonableness of this contract or the rates named. The time during which it was to run was brief, less than seven months, and but for the legislation of Congress there would be no question of its validity, or that it could be enforced without subjecting either party thereto to any liability, civil or criminal. On August 6 the Burlington Company and its connecting carriers filed with the Interstate Commerce Commission an amendment to their tariffs, which was duly posted and published, and by which the rate from Kansas City, Kansas, to New York was increased.

On August 17, 1905, the Armour Packing Company delivered

to the Burlington Company, under its contract, sixty-seven tierces of oleo oil for transportation to New York. The railway company accepted the shipment, issued a through bill of lading and received pay upon the basis of the rates fixed by the contract of June 17. Now, because the packing company insisted upon compliance by the railway company with its contract of transportation—and the railway company (recognizing the binding force of the contract) accepted the transportation and received payment at the rates named therein—the packing company is adjudged a criminal and fined the sum of $15,000.

I want to emphasize this matter. The railway company and the packing company entered into a fair and reasonable contract for transportation. Independently of the statute, it was valid in all respects, and could have been enforced by the packing company against the railway company, but according to the ruling of the court the railway company was authorized arbitrarily to break the contract, raise the amount to be paid for transportation—thus unsettling the business of the shipper, even it may be to the extent of wholly destroying it. Sustaining under those circumstances the power of the carrier and punishing the shipper shocks my sense of justice, and I cannot impute to Congress an intent by its legislation to make possible such a result.

It has been one of the boasts of our jurisprudence that it upholds the sacredness of contracts. By constitutional provision a State is estopped from passing a law impairing the obligation of a contract, and again and again has this court stricken down legislation having such effect. While there is no such restriction upon the power of Congress, yet Congress has in this case broken no contract. It has simply, as held by the court, given permission to a carrier, arbitrarily and without inquiry or decision by any tribunal, to repudiate its contract.

Again, we have held that in "enacting the statutes establishing the Interstate Commerce Commission the purpose of Congress was to facilitate and promote commerce." *Texas & Pacific Railway* v. *Interstate Commerce Commission*, 162 U. S.

197, 198. But to deny to parties the power of agreeing upon rates of transportation for a reasonable time tends to destroy and not promote commerce. One of the conditions of successful business—one of the things which induces new industries— is the ability to provide in advance for certainty of expenditures, including among them the cost of transportation. Who will engage in any new enterprise or invest money in a manufacturing industry when he knows that he cannot make a definite contract for rates of transportation to and from his factory, but is advised that whatever contract he makes may, at the whim of the carrier, upon ten days' notice, be set aside and a higher rate imposed?

Further, it seems to be implied that Congress has given express authority to the carrier to raise its rates, but this is not so. The single provision is that it shall not raise its rates without giving ten days' notice. It is a limitation upon power instead of a grant of authority.

It may be said that the remedy of the shipper is to pay the increased rates and then sue the carrier for the excess. But upon what ground can such an action be maintained? If the contract is no longer valid, if it has been destroyed by the mere action of the carrier in publishing a new tariff, and the rates of the latter are in themselves reasonable, although in excess of the contract provisions, how can a shipper recover damages? The contract is gone, has ceased to be valid, the new rates are reasonable, and the shipper must abide by the consequences of the arbitrary act of the carrier.

But, it may be said, that prescribing the limitation of ten days' notice of an increase in rates is an implied authority to the carrier to make such a raise, providing the new rates are reasonable. To my mind it seems more in accordance with the spirit and purpose of the Interstate Commerce Act to hold that, there being no express authority given to raise rates, the fact that the railway company has made a contract to operate for a reasonable time should be construed as an inhibition upon its right to make such a raise, and that the rates as fixed by its

contract should continue for all shippers until the termination of the period named therein.

Obviously, from the tone of the opinion of the court the wrong done to the shipper is recognized, and the argument is only that the responsibility for the wrong rests upon Congress. In other words, the court has unloaded upon Congress the injustice which the construction placed by it upon the statute accomplishes. To my mind a better way would be to enforce the contract and thus secure justice in this case, leaving to Congress the enactment of additional legislation, if deemed necessary, to prevent the possibilities of secret arrangements between carrier and shipper.

I am authorized to say that the Chief Justice and Mr. Justice Peckham concur in this dissent. They are also of the opinion that the trial court, the District Court of the Western District of Missouri, had no jurisdiction of the alleged offense, but that such jurisdiction was vested in the District Court of Kansas, holding that when goods are delivered to the carrier, and the shipper has solicited, accepted or received any rebate, concession or discrimination from such carrier, "in respect to the transportation" of the goods, the crime is then complete, at least so far as regards the shipper, and it cannot be made a continuing crime in each district through which the goods pass in their transportation. The Constitution has made provision for the venue of criminal actions or prosecutions, and their nature cannot be altered by legislative enactment, so as to embrace the whole country in one vast district. A provision in a statute of this nature by which it is possible to find an indictment and to have a trial at the most remote point from the actual commission of the offense, ought not to be approved as a compliance with the Constitution.