**UNITED STATES v. MILLER et al.**

No. 7967.

District Court, D. Nebraska, Omaha Division.

March 3, 1937.

Joseph T. Votava, U. S. Dist. Atty., and Ambrose C. Epperson, Asst. U. S. Atty., both of Omaha, Neb., and Burt L. Smelker, Atty., Bureau of Inquiry, Interstate Commerce Commission, of Washington, D. C.

O'Sullivan & Southard and Reed, Ramacciotti & Robinson, all of Omaha, Neb., for defendants.

DONOHOE, District Judge.

An indictment has been returned against the defendants, Phil Miller, Frank Sargent, and Francis B. Hearty, the first twenty counts of which are similar in content and charge in substance that at the times alleged:

(1) That Roberts Bros. & Rose Live Stock Commission Company, not herein indicated, was a partnership engaged in buying and selling livestock; that the defendant Phil Miller was an employee, to wit, a bookkeeper; that Frank Sargent was engaged as an individual in the business of buying and selling livestock; and that Francis B. Hearty was an employee, to wit, inspector for the Western Weighing and Inspection Bureau.

(2) That the railroad company was a common carrier engaged in the transportation of property in interstate commerce by means of railway lines, maintained from out the state of Nebraska to South Omaha.

(3) That at the times mentioned the common carrier had established its rates and charges in accordance with law.

(4) That the common carrier would transport for the said Roberts Bros. & Rose Live Stock Commission Company, as consignee, a carload shipment of certain property from without the state, and would deliver the property to the consignee at South Omaha, and would collect freight based and computed upon a minimum weight instead of on the true aggregate weight.

(5) That the defendants, well knowing the facts alleged in the indictment, unlawfully and knowingly received a rebate in respect to the aforesaid transportation of the aforesaid property of the difference between the true weight of the shipment and the minimum weight provided under the schedules and tariffs of rates.

(6) By the twenty-first count of the indictment, the defendants are charged with conspiracy to commit offense against the United States (title 18, § 88, U.S.C.A.). There are charged some thirty-nine overt acts in furtherance of the conspiracy. These acts, as charged, in substance consist of: (a) Placing false weight figures upon the freight bills by the defendant Phil Miller; (b) making and writing of checks by the defendant Phil Miller payable to the defendant Frank Sargent, from funds of Roberts Bros. & Rose Live Stock Commission Company; (c) the appropriation for his own use of moneys obtained on these checks by the defendant Frank Sargent; (d) the placing of false weight figures upon the freight bills by the defendant Francis B. Hearty, covering the carload shipments.

To the indictment, and each and every count thereof, the defendants have filed their motion to quash, which has heretofore been submitted to the court on oral argument and upon extensive briefs; the principal grounds of this motion to quash, which we think merits our attention, are:

(1) Do the defendants, since it is not charged that they are either carrier or shipper, come within the purview of the Elkins Act, as amended (49 U.S.C.A. §§ 41–43)?

(2) Were the acts, as charged against the defendants, committed in interference with interstate commerce, so as to constitute a violation of the Elkins Law?

First, we are earnestly importuned to construe the statute as applying in its criminal provision only to shipper and carrier. A careful reading of the debate in Congress leading to the passage of the law brings us to the disclosure that, while much of the discussion had to do with the practice then in vogue of collusion between the carrier and the shipper, still all the way through, permeating it all, there appears a firm will and determination on the part of the legislators to "once and for all" put an end to interference with the even flow of interstate commerce on the part of any one, whether person or corpo-

ration. An essence of the offense is interference, aside from the gain or loss occasioned thereby. Note the language of the law: "It shall be unlawful for any person, persons, or corporation to offer * * * or to solicit * * * any rebate, concession, or discrimination," etc. 49 U.S.C.A. § 41. And again: "Every person or corporation, whether carrier or shipper, who shall, knowingly, offer * * * or solicit * * * such rebates, concession, or discrimination," etc. 49 U.S.C.A. § 41. This language of the law clearly indicates the broader purpose, and does not justify the conclusion that Congress intended to limit the offenses described in it to shippers and carriers.

The Supreme Court of the United States has had occasion in a number of cases to construe the meaning, and purpose, of the act and that tribunal has consistently held that the purpose of Congress was to cut up by the roots every form of discrimination, favoritism, and inequality. Louisville & Nashville R. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297, 34 L. R.A.(N.S.) 671; New York, New Haven & H. R. Co. v. Interstate Commerce Commission, 200 U.S. 361, 26 S.Ct. 272, 50 L. Ed. 515; Armour Packing Company v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681; United States v. Union Stock Yard & Transit Co., 226 U.S. 286, 33 S. Ct. 83, 57 L.Ed. 226; United States v. P. Koenig Coal Co., 270 U.S. 512, 518, 519, 46 S.Ct. 392, 394, 70 L.Ed. 709.

■■ In the Koenig Coal Company Case, supra, the court said, after quoting the act: "This makes it unlawful for any one to receive any concession in respect of transportation of any property in interstate commerce by a common carrier whereby any advantage is given or any discrimination is practiced."

The charge in the first counts of the indictment in effect is that the defendants by a device worked a discrimination against the common carrier named, whereby they received and applied to their own use a part of the lawful freight; in other words, as a result of the device, practiced by the defendants, the common carriers in question were induced to and did transport the livestock for a sum of money less than they were entitled to receive, and less than other common carriers were receiving for transporting livestock a similar distance. The purpose of the statute is to protect the carrier, as well as the shipper, but it is

argued by counsel that a rebate concession or discrimination in respect to the transportation of any property must require a giver and a receiver, and, since the common carrier in this case did not voluntarily collect and receive less than its full compensation, and since the defendants are charged with fraudulently appropriating the money, that the transaction did not constitute a rebate, concession or discrimination. In answer to this argument, I call attention to the language of the Supreme Court of the United States in the Koenig Case, supra, in which the same contention was made: "It is asked, if this was a concession, by whom was it conceded? The answer is by the carrier. He granted the priority and therefore he made the concession and gave the advantage and practiced the discrimination. But it was unlawful, and he did not know the facts which made it so. The shipper knew them because he had secured it by his deceit and received it. What is there in the statute that releases him from guilt, because the carrier who yielded to him the concession, and gave him the advantage and made the discrimination, thought it was lawful?"

The case of Dye v. United States, 262 F. 6, 8 (Circuit Court of Appeals, Fourth Circuit), was a case very similar to the case at bar. The indictment was against one Dye alone, and charged in substance that he was an agent and employee of a railway company, had charge and supervision of the allotment and distribution of cars; that by means of a device he knowingly allotted, distributed, and placed at certain mines more cars than were allotted under the regulation of the Interstate Commerce Commission, and it was contended that these transactions of the defendant were an unlawful discrimination. It appeared from the evidence that the defendant himself, and not the mines, got the profit of the unequal distribution of the cars; that the mines in good faith received and loaded the cars in fulfillment of the contract to sell Dye himself fuel coal, and by his direction consigned them to a railroad company, and that while in transit Dye had the cars reconsigned to another company, to which he sold the coal as commercial coal, at a profit of $1.10 a ton to himself. The court, in passing on the alleged error of the trial court in failing to instruct, said: "The fallacy seems evident. Taking the cars from the supply available for distribution among the mines for commercial coal diminished the allot-

ment of the Buchanon Company and other mining companies to their disadvantage. It is true that Dye received the main benefit of this wrong, since he sold the coal as commercial coal when he had by deceit bought it at a lower price as fuel coal. But the Dorfee mine also received benefit from the wrong, though unwittingly, for it was enabled to get cars and keep its mines in operation, and sell and ship the coal for which the cars were used, presumably at a profit, although sold at the price of fuel coal. Dye's appropriation of the chief benefit supplied the motive. His pretense that the cars were for fuel coal, and his written denial to a complaining shipper that such transactions had taken place, made evident his knowledge that he was violating the law. Surely the defendant could not be relieved of the guilt of this discrimination in favor of the Dorfee mine, on the ground of variance between the charge and the evidence, by proof that he clandestinely appropriated to himself the main profit of the discrimination. On the contrary, the inference that he discriminated for his own benefit necessarily implied that there had been discrimination in favor of the Dorfee mine by sending it an excess of cars as a condition precedent to his reaping the principal fruit of the discrimination."

This case was cited with approval by the Supreme Court of the United States in the Koenig Coal Company Case, supra. Note the following from that opinion: "In Dye v. United States (C.C.A.) 262 F. 6, a defendant in an indictment under the Elkins Act was the agent of a carrier and was in charge of the distribution of cars between coal mines during an emergency and car shortage. By a device, he violated the rule of distribution established by the Commission and secured an excessive number of cars for a particular mine, the operators of which were innocent of the inequality. He did this for his personal profit by sale of the excess. His conviction was sustained by the Circuit Court of Appeals for the Fourth Circuit."

In this Dye Case, while it is said that the defendant was the agent of the railroad company, it may not be said that in his fraudulent conduct he was acting within the scope of his authority, or that the principal could be held in any respect for his unlawful act, so that with this law in mind, in so far as the prosecution under the Elkins Law is concerned, he was acting as an individual in his individual ca-

pacity for his own private profit. Of course, in obtaining his private profit by the device which he used, he effected a discrimination in favor of the mines. In the case at bar, the defendants, while acting in their private capacity and as individuals, and for their own gain and profit, by the device which is charged, worked a discrimination against the shipper of the livestock, whereby the carrier was deprived of its just freight rate in violation of the Elkins Law.

The defendant, Dye, in the case above quoted, since he was not acting within the scope of his authority, but in violation of law, was not a carrier, but was held subject to the provisions of the law, and so the defendants in this case, if they are said not to be shippers, are to the same extent amenable to this section of the law

■ On the second proposition, it is urged that the shipment had come to rest, and ceased to be in interstate commerce, and consequently any acts of the defendants touching the shipment was not in interference with interstate commerce. A complete answer to that contention is that the transaction in interstate commerce had not come to rest. True, the movement of the livestock had been completed, but the transaction would not be completed until the lawful freight rate had been paid and received. The law under which this action is proceeding does not pertain to the shipment alone, but to any interference with or manipulation of the cost or manner of transportation. The transaction does not come to rest until the lawful freight charge is duly paid and received. In other words, when the transaction was fully and finally completed, then the interstate commerce feature ceased, but not until then.

■ As to count 21 of the indictment, since we believe the first twenty counts charge an offense against the United States, we must hold that the motion as to this count is not well taken.

Many other grounds of objection are raised by the motion to quash, but we do not consider them of such a serious nature as to require us to quash the indictment. The defendants have filed a motion for a bill of particulars, which motion has been largely sustained, and this we think will cure any other defects of the indictment which we have not here noticed.

The motion to quash will therefore be overruled. Exception will be allowed.