## HOCKING VALLEY RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit.   February 3, 1914.)

### No. 2351.

1. CARRIERS (§ 38*)—OFFENSES—CARRIAGE AT LESS THAN TARIFF RATES.

Interstate Commerce Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3156), as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 (U. S. Comp. St. Supp. 1911, p. 1292), provides that it shall be unlawful for any common carrier to charge, demand, collect, or receive a greater or less compensation for the transportation of property between points to which a joint rate is made than that specified in the schedule filed with the Interstate Commerce Commission.   Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 (U. S. Comp. St. Supp. 1911, p. 1311), provides that the willful failure on the part of any carrier strictly to observe its tariff filed and published as required by that act and the Interstate Commerce Act shall be a misdemeanor.   Held that, while carrying at a less or different rate than the tariff rate is not in terms declared an offense or penalized, it is punishable as a failure strictly to observe such tariff.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

2. CRIMINAL LAW (§ 1026*)—PLEA OF NOLO CONTENDERE—OPERATION AND EFFECT.

While a plea of nolo contendere is in some respects in the nature of a compromise between the state and the defendant, and while the defendant may not have under such plea all the advantages of exception and review that could be saved by a plea of not guilty or by standing mute, the defendant notwithstanding such plea may have the question whether the indictment charges an offense determined on writ of error, as this objection might be urged under a plea of guilty.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2615–2618; Dec. Dig. § 1026.*]

3. CRIMINAL LAW (§ 1144*)—APPEAL—HARMLESS ERROR.

Where the sentence under a plea of nolo contendere was general and less than the maximum possible under three counts, and four of the counts in the indictment were good, it was immaterial whether the others were good or not.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2736–2764, 2766–2771, 2774–2781, 2901, 3016–3037; Dec. Dig. § 1144.*]

4. CARRIERS (§ 32*)—OFFENSES—UNLAWFUL "DISCRIMINATION."

The giving of several months' credit for the payment of freight charges to one shipper pursuant to a contract antedating the shipments, while

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

other shippers under the same circumstances were required to settle promptly after the end of each calendar month for freight shipped during that month and to give a bond that the freights would be paid, although legal interest was paid by the shipper given such credit, was a concession or discrimination in respect to transportation within Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 (U. S. Comp. St. Supp. 1911, p. 1311), providing that it shall be unlawful for any person to offer, grant, or give any rebate, concession, or discrimination in respect to the transportation of any property in interstate commerce whereby such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by the carrier, or whereby any other advantage is given or discrimination practiced, since "discrimination" in ordinary understanding and definition is the act of treating differently, and is the antithesis of advantage, and the extension of such credit is an extension of an advantage to such shipper involving a correlative discrimination in respect to those not so favored.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83-85; Dec. Dig. § 32.*

For other definitions, see Words and Phrases, vol. 3, p. 2099.]

**5.** CARRIERS (§ 23*)—OFFENSES—UNLAWFUL DISCRIMINATION.
The provision of Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 (U. S. Comp. St. Supp. 1911, p. 1311), that it shall be unlawful to give any concession or discrimination in respect to the interstate transportation of property whereby such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, cannot be restricted by the narrower language of Interstate Commerce Act Feb. 4, 1887, c. 104, §§ 2, 3, 24 Stat. 379, 380 (U. S. Comp. St. 1901, p. 3155), which prohibit "unjust" discrimination and the imposition of any "undue" or "unreasonable" prejudice or disadvantage.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 57-59; Dec. Dig. § 23.*]

**6.** CARRIERS (§ 32*)—OFFENSES—UNLAWFUL DISCRIMINATION.
Under Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 (U. S. Comp. St. Supp. 1911, p. 1311), prohibiting the giving of any concession or discrimination in respect to interstate transportation of property whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, or whereby any other advantage is given or discrimination practiced, while differentiations between shippers so trifling in amount and inoperative in character as not to give one a real substantial advantage over another, might not be a forbidden discrimination, if the court can say as matter of law that the distinction made is or might be material and substantial, giving to the favored shipper a real advantage which others do not have, it is a forbidden discrimination.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83-85; Dec. Dig. § 32.*]

**7.** CARRIERS (§ 32*)—OFFENSES—UNLAWFUL DISCRIMINATION.
Under such act the extension of long credit to one shipper, pursuant to a prior arrangement, while other shippers under similar circumstances are required to settle promptly, is unlawful, though such discrimination has not been forbidden by the Interstate Commerce Commission, since while it may sometimes be appropriate or necessary for the Commission by administrative ruling to determine what is discrimination, as where circumstances and conditions must be compared to see if they are sim-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ilar, such extension of credit is ipso facto a forbidden discrimination, and no ruling of the commission can make it lawful.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*]

8. CARRIERS (§ 32*)—OFFENSES—UNLAWFUL DISCRIMINATION.
    Under such act, such extension of credit was unlawful, though such other shippers, not knowing of such privilege granted to the favored shipper, had not demanded that the same privilege be extended to them.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*]

9. CARRIERS (§ 32*)—OFFENSES—UNLAWFUL DISCRIMINATION.
    Where a carrier which had issued and published tariff rates through to destination and issued through bills of lading extended to one shipper credit for freight charges pursuant to a prior agreement, while other shippers under similar circumstances were not given such credit, it violated such act, although the favored shipper paid a part of such freight charges in cash, and although the amount paid may have equaled or exceeded the part of such freight charges to which such carrier was entitled, and the part for which credit was given was that earned by the connecting carriers; it not appearing that such carrier did not promptly account to its connecting carriers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson Commission Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

In Error to the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

The Hocking Valley Railway Company was convicted of offenses (194 Fed. 234), and it brings error. Affirmed.

J. H. Hoyt, of Cleveland, Ohio (Lawrence Maxwell, of Cincinnati, Ohio, Clarence Brown, of Toledo, Ohio, and John F. Wilson, of Columbus, Ohio, of counsel), for plaintiff in error.

U. G. Denman, U. S. Atty., and John S. Pratt, Asst. U. S. Atty., both of Toledo, Ohio.

Before KNAPPEN and DENISON, Circuit Judges, and COCHRAN, District Judge.

DENISON, Circuit Judge. The railway company was indicted for giving special concessions to the Sunday Creek Company, one of its coal shippers, in violation of the Interstate Commerce Act and the Elkins Act. After demurrers to all the counts had been overruled, and after certain counts of the indictment had been dismissed, there remained ten, and to each of these counts the defendant, by leave of the court, pleaded nolo contendere. The defendant was thereupon by th court found guilty upon each of these counts, a motion in arrest of judgment was overruled, and the defendant was fined $42,000.

The railway company assigns as error that the indictment was fatally insufficient, so that there was nothing to support the judgment.

[1] The whole question involved is whether the giving of credit by a railway company to a shipper, under the conditions and circum-

stances here existing, constitutes a violation of section 6 of the Act of 1887 to regulate commerce, as amended June 29, 1906 (34 Stat. 586, 587), taken in connection with the Elkins Act of February 19, 1903, as amended June 29, 1906 (34 Stat. 587, 588). The specific portions thought applicable are those providing that the schedules giving tariff rates shall also state all privileges allowed which in any wise affect the tariff rate; that the carrier shall not collect or receive a greater or less or different compensation than the tariff rates, and shall not extend to any shipper any privilege in the transportation of property not specified in the tariff; that the willful failure by a carrier strictly to observe such tariff shall be a misdemeanor; and that it shall be unlawful for the carrier to give any concession or discrimination in respect to the transportation of property whereby it is transported at a less rate than that named in the tariff, or whereby any other advantage is given or discrimination is practiced, and that the carrier, giving such discrimination, is guilty of a misdemeanor. While carrying at a less or different rate is not in terms declared an offense or penalized, the same result follows from the fact that such carrying, willfully done, would be that failure "strictly to observe" such tariff which is expressly, by a later clause, made a misdemeanor. So we think it clear that a prosecution will lie for the offense of "carrying at a less or different rate." The two specific questions presented, then, by this record are whether extending to the shipper, who is to prepay his freight, such credit as was here given, is collecting a less or a different rate than the tariff, and whether such conduct amounts to granting a concession whereby any advantage is given or discrimination practiced.

[2] Before considering the sufficiency of the indictment, a preliminary question must be met: Was the plea of nolo contendere such a submission to the discretion and mercy of the court as to preclude the company from afterwards prosecuting error? An interesting discussion and review of the practice under this plea are found in the opinion of the Circuit Court of Appeals of the Seventh Circuit, in Tucker v. United States, 196 Fed. 260, 116 C. C. A. 62. This discussion seems to confirm the view that the plea is, in some respects, in the nature of a compromise between the state and the defendant, and that the latter may not have all the advantages of exception and review that could be saved to him by plea of not guilty or by standing mute; but it does not follow that the defendant, in such case, cannot prosecute error at all. In the instant case, the controlling question is not one of niceties in pleading or of refinement in construction or application; it is the broad general question of whether the acts described do or do not constitute an offense against the criminal law. If the railway company is right in its contentions, its plea could not be taken as a final admission of the offense, because no offense was charged; it could not be guilty of a crime, because no crime had been committed. It seems to be the settled rule that, even after explicit plea of guilty, defendant may urge, in the reviewing court, such an objection (Carper v. Ohio, 27 Ohio St. 572; Com. v. Hinds, 101 Mass. 209; 12 Cyc. 353, note 35); and we are satisfied that the plea of nolo contendere should not be construed as a waiver of a right which the plea of guilty does not

waive (U. S. v. Hartwell, 26 Fed. Cas. 196, 201, 3 Cliff. 221; Com. v. Horton, 9 Pick. [26 Mass.] 206; Com. v. Grey, 2 Gray [68 Mass.] 501, 61 Am. Dec. 476). We must therefore examine on their merits the questions presented.

The ten counts are divisible into three groups. Counts 4, 5, and 6 undertook, particularly, to allege the acceptance of a "less or different compensation" and the extension of a "privilege in regard to transportation" not specified in the tariffs on file. They cover, respectively, the shipments for the months of March, April, and May, 1909. The second group—counts 17, 18, 19, and 20—cover the respective shipments for the months of August, September, October, November, 1909, and allege discrimination during these months in favor of the Sunday Creek Company and against other coal shippers in like situation. The third group does not require separate consideration, because the counts of this group only allege individual instances of discrimination included within the monthly totals covered by the counts of the second group.

The sixth count will serve to illustrate the first group. It alleges that during May, 1909, the railway company received from the Sunday Creek Company and shipped 11 cars of coal destined to points on other roads and beyond the state line; that these were all treated as "prepaid freight," the total charges to destination being payable by the Sunday Creek Company to the railway company; that the total of freight charges to destination for such shipments, at tariff rates, was about $600; that during the same period, and for prepaid freights on cars of coal destined to points within the state, the Sunday Creek Company incurred an obligation of $24,600; that at the regular monthly accounting and settlement between the railway and the shipper, had on June 28, 1909, for the May shipments, the total indebtedness of $25,200 was settled by paying the odd $200 in cash and by giving the Sunday Creek Company's note at four months with 5 per cent. interest for $25,000; that the railway company neither made any demand for, nor collected in cash, this $25,000, but that the note therefor was given and received in accordance with an arrangement antedating the shipments; that the note was not paid but was renewed from time to time, interest being paid until April 1, 1910, when it was merged into three-year debenture bonds.

Count 17, which may be taken as typical of the second group, alleged facts similar to count 4, and, further, that other shippers, in all respects similarly situated, were required, at the time of the shipments, to give bond that the freights would be paid, and were also required to make payment in cash promptly after the monthly settlement.

[3] As to the first group—counts 4, 5, and 6—it is argued that a payment after four months, and with legal interest, is the same thing as cash, and that a solvent shipper who receives such credit does not thereby get a "less or different rate." It is further urged that the phrase "privilege in the transportation," used in section 6, refers to something which is directly connected with, or attendant upon, the physical transportation, and does not extend to the method of making freight payments. If there is merit in either of these contentions

(which we do not intend to intimate), they do not require decision now. The conviction was general, the sentence was general, and was less than the maximum possible under three counts; in other words, the sentence would be sufficiently supported by three counts. If therefore the four discrimination counts—17, 18, 19, and 20—are good, as we think they are, there is no reason to consider any others. Claassen v. U. S., 142 U. S. 140, 146, 12 Sup. Ct. 169, 35 L. Ed. 966; Hardesty v. U. S. (C. C. A. 6) 168 Fed. 25, 26, 93 C. C. A. 417; Bennett v. U. S. (C. C. A. 6) 194 Fed. 630, 633, 114 C. C. A. 402.

[4] Upon the broad and underlying question whether it is such discrimination as is forbidden by the Elkins Act, in force in 1909, for the carrier to insist that shippers generally pay cash while it gives long credit to another similar shipper, and gives such credit pursuant to a previous contract—upon this broad question, we have no doubt. Such conduct, by its very terms, is discrimination. Shippers are not treated alike. Giving to one shipper four months' time in which to raise the the money, even if interest is added, while the same privilege is denied to others, is plainly a "concession or discrimination." It also must be considered a concession or discrimination "in respect to transportation"; it cannot be thought that these two words in this clause of the Elkins Act pertain only to a facility of transportation; they are used in immediate connection with "rebate," and so the clause must be intended to reach and affect the subject of freight payments. Whether, by this concession, it results that the property is "transported at a less rate than that named in the tariffs" is not important, because the statutory condemnation extends also to concessions "whereby any other advantage is given or discrimination is practiced." Such a discrimination might or might not be of pecuniary value to the freight payer. It is conceivable that a shipper, with sufficient working capital upon which he could not otherwise earn 5 per cent., would save money by paying cash; but it is clear that such a system of freight credits amounts to loaning money to the shipper, and is equivalent to providing for him working capital. To say that this cannot be considered a concession, or, when unfairly practiced, a discrimination, is, we think, to deny to these words their plain meaning. As Judge Killits, in his opinion below, well says:

"The first impression one gets from the statement of facts is that the Sunday Creek Company was substantially favored by the device in question, that it was given, by the defendant, a decided advantage over its fellows in business at Nelsonville; and further study of the situation tends in no wise to weaken that early feeling. 'Discrimination,' in ordinary understanding and definition, is the act of treating differently; it is the antithesis of advantage; one who enjoys an advantage over another at the hands of one with whom they have common dealing has his fellow within a corresponding discrimination; the positive measures the extent of the negative. * * * If extending credit for freight charges to one shipper while exacting cash payments from his competitor in the same and contemporaneous enterprises is not extending an advantage to such shipper which involves a correlative discrimination in respect to transportation against those not so favored, the court is wholly in error. * * * As we have before suggested, the impression comes quickly and abides tenaciously that such treatment is a decided advantage to the one so favored, that advantage which is as measurable and substantial as the inevitable discrimination which it creates against those who are compelled to compete in business on the basis of such partiality."

Not only is the conclusion that the described practice does constitute that discrimination against which this provision is directed the natural inference from the words of the statute, but the general purpose of the law and of the amendments here to be enforced, as repeatedly declared by the Supreme Court, indicates the same broad interpretation; if, indeed, there is in the word "discrimination" ambiguity to be construed. On this subject, the Supreme Court has said:

"The purpose of Congress was to cut up by the roots every form of discrimination, favoritism, and inequality." L. & N. R. Co. v. Mottley, 219 U. S. 467, 478, 31 Sup. Ct. 265, 269 (55 L. Ed. 297, 34 L. R. A. [N. S.] 671).

"The legislative department intended that all who obtain transportation on interstate lines shall be treated alike in the matter of rates, and that all who avail themselves of the services of the railway company * * * shall be on the plane of equality." Chicago, I. & L. Ry. Co. v. U. S., 219 U. S. 486, 496, 31 Sup. Ct. 272, 274 (55 L. Ed. 305).

"The Elkins Act proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike." Armour Co. v. U. S., 209 U. S. 56, 72, 28 Sup. Ct. 428, 432 (52 L. Ed. 681). See, also, Chicago & Alton v. Kirby, 225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033, and U. S. v. Union Stock Yards, 226 U. S. 286, 33 Sup. Ct. 83, 57 L. Ed. 226.

Against this natural and broad interpretation of the prohibition of "discrimination," defendant urges that the giving of credit for freights in the discretion of the carrier was a very common practice; that the practice had been judicially sustained and declared not to be discrimination; that the practice and these decisions must have been known to Congress when making amendments to the law; that no amendment was expressly directed against the practice; and hence that the word must still receive its judicially-established construction. This contention requires study of the decisions mentioned. They are three: The opinion of Judge Thayer, for the Eighth Circuit Court of Appeals, in Little Rock Co. v. St. Louis Co., 63 Fed. 775, 11 C. C. A. 417, 26 L. R. A. 192; the opinion of the Fifth Circuit Court of Appeals, by Judge McCormick, in Gulf Co. v. Miami Co., 86 Fed. 407, 30 C. C. A. 142, and Judge Sanborn's opinion (8th C. C. A., 168 Fed. 161, 94 C. C. A. 217, 21 L. R. A. [N. S.] 982, 16 Ann. Cas. 613), in Gamble-Robinson Co. v. Chicago Co.

The Little Rock Case was a civil action by one railroad against another, complaining because the defendant required plaintiff to prepay freight charges on the freight which it, as an initial carrier, delivered to defendant for further transportation, while defendant did not make the same requirement from the other connecting initial carriers. The common-law right of the carrier to demand cash payment or to give credit for freights was declared; and the case was seen to depend wholly on the provision in the third section of the act declaring that a carrier should not subject any particular person to any undue or unreasonable disadvantage. Judge Thayer expressly says that the statute permits one person to be "lawfully subjected to some disadvantage in comparison with others, provided it is not an undue or unreasonable disadvantage." It was then held that the exercise of this common-law right, which many times would be justified by ordinary business principles, could not be held to be, inherently, undue or unreasonable action.

Obviously, this holding cannot be applied to a statute which prohibits absolutely any disadvantage, without regard to its undue or unreasonable quality.

The Gulf-Miami Case presents, so far as this point is concerned, a situation like, but converse to, that of the Little Rock Case. Plaintiff was the connecting and continuing carrier and complained because defendants, initial carriers, delivered traffic to plaintiff's competitors without requiring payment of the freight then accrued, while insisting on such requirement against plaintiff. The substance of the decision is that the court could not, on the facts of that case, say that this conduct constituted the "unjust discrimination" prohibited by the then existing language of the Interstate Commerce Act. The case, however, mainly depends upon the lack of obligation on the part of the initial carriers to establish any through routes and joint rates by way of the plaintiff's line, as they had done by way of its competitors' lines, and the resulting lack of "like circumstances and conditions" attending plaintiff and its competitors.

The Gamble-Robinson Case was based upon transactions occurring on December 15, 1906. The Elkins Act and section 6 of the Interstate Commerce Act were, at that date, in the same form involved in the instant case; the so-called Hepburn Act having been approved June 29, 1906. Nevertheless, for some reason which the whole record would doubtless disclose, Judge Sanborn considered only section 4 of the act, directed against "undue or unreasonable preference or advantage," and, speaking of the Interstate Commerce Act, expressly says (168 Fed. 164, 94 C. C. A. 220, 21 L. R. A. [N. S.] 982, 16 Ann. Cas. 613):

"That act did not make all preferences, advantages, prejudices, or disadvantages unlawful, but those only which are 'undue and unreasonable.'"

And in that connection he refers (168 Fed. 165, 94 C. C. A. 221, 21 L. R. A. [N. S.] 982, 16 Ann. Cas. 613) to decisions of the Supreme Court as upholding practices which, "though clearly discriminatory, were not undue or unreasonable," and which, although creating "clear inequality and discrimination, did not give * * * an undue or unreasonable * * * disadvantage." The decision reached by a majority of the court in the Gamble-Robinson Case was that the refusal of credit there involved (while others, generally, were given credit) could not be said to be that "unjust discrimination" which alone was forbidden. From this decision, Judge Hook forcefully dissented; but, giving full force to the majority opinion, we cannot see its application to the Elkins Act; indeed, its implications are that under that statute the practices involved in the instant case would have been condemned.

[5] We do not overlook the contention that sections 2 and 3 of the Interstate Commerce Act still retain their reference to "unjust discrimination" and "undue or unreasonable prejudice or disadvantage" (though these sections must now be read in connection with section 6, as amended in 1906); but this does not detract from the inferences necessarily arising from the language of the Elkins Act. While this act related to interstate commerce, it was independent in form from the Interstate Commerce Act. It was "An act to further regulate commerce." It purported to cover, generally and perhaps exclusively, the

subject of penalties, and it cannot be restricted by narrower language allowed to remain without change in the act of 1887. The Elkins Act not only dropped the express words of limitation; it added a broad and sweeping "whereby" clause.

[6] Nor do we overlook the contention that the word "discrimination" inherently implies something unjust or unreasonable. In a certain sense, this is true, as is especially pointed out in Judge Kohlsaat's opinion in U. S. v. Wells Fargo Co. (C. C.) 161 Fed. 606, 610. That differentiation between shippers which was so trifling in amount and inoperative in character that it did not give one a real and substantial advantage over another, and, to that extent, indicate that it was unfair and undue, might not be within any fair definition of a penalized discrimination. This is all that the Supreme Court necessarily means in its reference to the purpose of the Elkins law to prevent "all acts of undue discrimination." U. S. v. Wells Fargo Co., 212 U. S. 522, 531, 29 Sup. Ct. 315, 53 L. Ed. 635. By omitting the limiting words "undue and unreasonable," in its denouncement of discrimination, the Elkins Act has avoided the contention that such a limitation was too vague to be the basis of criminal prosecutions, in which, upon the same facts, one jury might acquit and another might convict. If the court can say, as matter of law, that the distinction made is or might be[1] material and substantial, giving to the favored one a real advantage, which others did not get, then it becomes the forbidden discrimination; if the facts do not justify this declaration, but the acts can, at most, have only negligible results or are on debatable ground, then it may well be that the principle referred to in U. S. v. Brewer, 139 U. S. 278, 288, 11 Sup. Ct. 538, 35 L. Ed. 190 (and see Tozer v. U. S. [Brewer, J.] 52 Fed. 917, and L. & N. Ry. Co. v. Com., 99 Ky. 132, 35 S. W. 129, 33 L. R. A. 209, 59 Am. St. Rep. 457) would bar a prosecution. In many such cases, there will be individual circumstances, such as lack of pecuniary responsibility or the previous unsatisfactory conduct of the shipper (as in the Gamble-Robinson Case) which would prevent an arbitrary inference of real discrimination; for this cannot rightfully be predicated on mere difference. Unless the difference is found in the two cases in the same environments, it is not, necessarily, discrimination.

Our conclusion here is not affected by these queries as to just how far the thought of unreasonableness still inheres in the proper definition of "discrimination" under the Elkins Act. In the instant case, the four months' credit given to one favored shipper, and then extended for longer periods, was a material and substantial distinction. It was of that character which might permit the favored shipper to continue in business and drive all others out of business. It is obvious that if continued it might rapidly accumulate into a very large sum. It can-

[1] "The courts are not concerned with the question as to whether, in a particular case, there had been any discrimination against shippers or harm to other dealers. The statute is general and applies not only to those particular instances in which the carrier did use its power to the prejudice of the shipper, but to all shipments which, however innocent in themselves, come within the scope and probability of the evil to be prevented." D., L. & W. R. R. v. U. S. (Dec. 1, 1913) 231 U. S. 363, 34 Sup. Ct. 65, 58 L. Ed. ——.

not be thought so free from objectionable quality as not to be clearly within that general prohibition from which the express modification has been dropped. We do not say that all credit or forbearance is discrimination. A practice by which those shippers or consignees who had established their financial credit and satisfactory business habits were suffered to delay payment until convenient, but frequent, settlement periods, while others were required to pay cash on delivery, might not be, of itself, forbidden. Delays caused by inability to collect or an extension of time given as the best means of treating a past-due and doubtful freight account, might be justified. These thoughts do not reach a case where it was agreed before shipment that the favored shipper should have the incidental delays and forbearance customarily given to all shippers, and should then, in addition, receive a considerable further extension of credit while cash payment was then to be collected from all others.

Being thus satisfied of what we may call the prima facie wrongfulness of the practice here pursued, it remains to inquire whether any one of the special reasons urged by defendant why this prosecution will not lie is convincing.

Obviously, the situation disclosed by the indictment is inconsistent with the same kind of cash payment which may be exacted from consignees simultaneously with delivery. Where the shipper is to pay the freight, payment on delivery of the goods to the carrier would be payment in advance. The agreed transportation service might be long delayed or never performed. A great part of the charges is often made up, as in this instance, of amounts which the initial carrier is to pay over to connecting and delivering carriers, and these payments will naturally be delayed until convenient accounting periods. The present indictment recognizes this commercial situation by alleging:

"That in the practical operation of the business of shipping coal over the said the Hocking Valley Railway Company, and over other railroad lines doing a like and contemporaneous service in the coal regions of Ohio, there was of necessity and convenience a business plan and usage in dealing with what was and is known as 'prepaid freight' shipments, that is to say, with shipments on which the entire freight charges were to be charged by and paid to the initial carrier at shipping point and point of origin by the shipper and consignor, whereby the initial carrier extended credits to coal shippers, with monthly settlements, that is to say, the entire charges for all such 'prepaid freight' shipments for each calendar month would be charged to the respective shippers at point of origin of shipment, and that shortly after the end of such calendar month collection in legal money would be, by the initial carrier, made from the shipper, of the entire amount of such 'prepaid freight' charges for such month, which said 'prepaid freight' charges would include not only the amount due to and earned by the initial carrier as the charge for transportation over its own line, but would likewise, and in addition thereto, include the charges due all connecting carriers for transportation to points of destination of shipments; that such extending of credits from month to month was a practical business necessity and usage in the handling of coal shipments and in taking care of the accounts arising therefor; that the said business plan and usage of so extending credit did not include or allow the giving to any shipper by any such carrier of any further credit beyond that of allowing the charges for each respective calendar month to be paid shortly thereafter, and as soon as the accounting department of the railroad company could in the regular course of business, prepare such account."

[7] Based upon the fact thus conceded by the indictment that some measure of credit was, of necessity, given to all shippers, counsel for the carrier argue that not all credit is, in itself, wrong; that abuses in giving credit can only be reached by regulations and orders of the Interstate Commerce Commission; and that, until such regulation or order has been made and disobeyed, there can be no prosecution. They base this last conclusion upon U. S. v. Pacific & Artic Co., 228 U. S. 87, 33 Sup. Ct. 443, 57 L. Ed. 742. There is language in this decision of the Supreme Court which, standing alone, might imply that a prosecution under the Elkins Act for discrimination will not lie until after the Interstate Commerce Commission has acted; but we do not think the opinion intends to lay down a general rule to that effect. The record in that case shows that the only discrimination charged consisted in the refusal to establish a through route and rate by way of one connecting carrier while this advantage was given to another connecting carrier. Another section of the act expressly commits to the discretion of the Interstate Commerce Commission to determine when through routes and rates should be established; and to hold that, in such case, the order of the Commission must precede a criminal prosecution is wholly in keeping with the analogous holdings regarding civil actions. Texas Co. v. Abilene Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Robinson v. B. & O. R. R., 222 U. S. 506, 32 Sup. Ct. 114, 56 L. Ed. 288; Pa. R. R. v. International Co., 230 U. S. 184, 196, 197, 33 Sup. Ct. 893, 57 L. Ed. 1446; Mitchell Co. v. Pa. R. R., 230 U. S. 247, 257, 33 Sup. Ct. 916, 57 L. Ed. 1472. The principle of these cases seems to be that, when the practice involved is forbidden by the very words of the law, the appropriate action may be predicated on the practice, but that either where other sections of the act indicate or where the uncertain character of the prohibition requires definitive action by the Commission, then such action is a prerequisite. It may sometimes be appropriate or even necessary for the Commission, by administrative ruling, to determine what is or is not discrimination. This will generally be so where circumstances and conditions must be compared to see if they are "like." It may well be that the Commission could and should regulate the practices referred to in the above-quoted extract from the indictment, and declare to what extent such practices might rightly be considered the equivalent of cash payment; but, discrimination once defined, no ruling of the Commission can make it lawful. It is forbidden by the words of the statute. When we reach the conclusion which we have already expressed that the discriminatory extension of credit here involved was, ipso facto, the forbidden discrimination, we necessarily declare that the question is vitally different from that decided in U. S. v. Pacific & Arctic Ry.

[8] Criticism is also made upon the sufficiency of the allegations that other shippers were not as well treated, and it is pointed out that the indictment does not show that any other shipper asked or was refused similar credit. This is true. No such demand or refusal is alleged; but the indictment does show that at the same time eight other named companies were engaged in the same vicinity in mining and shipping coal over the same railway under conditions similar to, and

substantially like, those of the Sunday Creek Company, that from each of said other shippers the railway company demanded and collected, in legal money, shortly after the close of the month and at the time of the settlement of the business of the month, the entire amount of freight charges accrued during that month for prepaid freight from each of these shippers, and that, from each of such other shippers, the railway company demanded and obtained a bond with surety guaranteeing the payment of the prepaid freight charges to accrue from month to month, but did not require any such bond from the Sunday Creek Company. These statements must be taken in connection with the already mentioned allegation that this four months' further credit was given in pursuance of an arrangement and· understanding had and existing before and at the time of such shipments.[2]

We see no occasion for any more express allegation that other shippers were not given credit; from the others, prompt cash payments were "demanded and collected." Certainly, giving such favor to one shipper, pursuant to previously existing contract, and demanding and collecting prompt payment from others, is discrimination. It cannot be necessary that the others should have known of the partiality and should have demanded equal treatment. Such concessions are naturally not made generally known.

[9] It is further said that the amount of cash collected on a monthly settlement (e. g., $182) was, or may have been, as much as all the Hocking Valley part of the interstate hauls involved; in other words, that so much of the prepaid interstate freight as entered into the four months' notes, represented, not the rates and charges of the Hocking Valley for its transportation services, but the amounts which had been or were to be paid to the connecting and delivering carriers. We assume that the indictment, for lack of definite statement, may be open to this construction; but this assumption does not make it bad. The Hocking Valley was the initial carrier, it issued and published tariff rates through to destination and issued through bills of lading. It cannot be material, in such case, whether the concession or discrimination practiced by the initial carrier with reference to prepaid freight concerns the earnings on its part of the through run or on some other part thereof. In making the through rate and in collecting or accounting for the prepaid freight, it was the active agent. There is no suggestion in this indictment to affect the natural presumption that the initial carrier billing this freight as prepaid promptly accounted therefor to its connections.

---

[2] The allegation, more precisely stated, is that the total prepaid freight for the month was $30,182, of which $274 only was for interstate traffic; that the carrier received $182 in money and took the shipper's note for $30,000 payable in four months at five per cent. interest, without any effort being made on the part of the carrier to enforce the payment in money of the entire amount of its charges or to so enforce the payment in money of any amount in excess of the $182 paid, "but that said amount was so taken and accepted in pursuance, etc." This statement that this amount was so taken fairly refers to the whole transaction, and means that the cash and the note were so taken in pursuance, etc., or in substantial effect that this credit was given in pursuance, etc.

Considering, as we do, only the discrimination counts, we are not concerned with the controversy whether the notes should be considered as having been taken in satisfaction and payment of the existing indebtedness—that is, practically in the place of cash and in payment for the freight bills—or whether they should be treated as collateral to the continuing and undischarged indebtedness. If this controversy has any substance, it must be in the construction of section 6. When we are considering a discrimination which consisted in giving to one and in not giving to another a four months' credit, and when the credit so given was not recalled or canceled, but was in fact continued for the whole period (and much longer), it is quite immaterial whether the carrier had the legal right during the four months' period to disregard the credit arrangement and demand immediate payment. Whatever its right, it did not do so, and the discrimination continued in its active and operative effect.

We have not considered the assignments of error in their order, or mentioned all of the points urged in argument against the judgment; but those not mentioned do not seem to us as forceful as these we have discussed.

The judgment is affirmed.