### UNITED STATES v. METROPOLITAN LUMBER CO. et al.
(District Court, D. New Jersey. November 30, 1918.)

1. CARRIERS &⟶38—OFFENSES—DISCRIMINATIONS.
     Elkins Act, § 1, as amended by Hepburn Act' (Comp. St. 1916, § 8597), embraces the granting or receiving of discriminations or concessions, in transportation service, irrespective of whether they in any way affect transportation rates or charges.

2. CARRIERS &⟶38—OFFENSES—DISCRIMINATIONS.
     The receipt of discriminations or concessions in transportation service falls within the criminal provisions of the Elkins Act, as amended by the Hepburn Act (Comp. St. 1916, § 8597), although they were procured by misrepresentations, and were thus granted without knowledge or connivance of the carrier.

3. CARRIERS &⟶38—OFFENSES—INDICTMENT.
     Indictments charging violations of the Elkins Act, as amended by the Hepburn Act (Comp. St. 1916, § 8597), in that defendants by misrepresentations obtained the transportation of goods on which a railroad embargo had been laid, *held* to sufficiently allege a discrimination, showing other persons were denied the same transportation service defendants enjoyed.

4. CARRIERS &⟶38—OFFENSES—"SHIPPERS."
     One is a "shipper," within the meaning of Elkins Act, § 1, as amended by Hepburn Act (Comp. St. 1916, § 8597), who, although a consignee,

exercises such direct control over shipments of commodities consigned to him by another as enables him, by his own act, to procure for himself discriminations in respect to transportation service.

**5. CARRIERS ☜38—OFFENSES—DISCRIMINATIONS—EMBARGO.**

Where defendants by misrepresentations, etc., obtained transportation despite a railroad embargo, thus violating the Elkins Act, as amended by the Hepburn Act (Comp. St. 1916, § 8597), *held*, that prosecution could not be defeated because the embargo had not been submitted to the Interstate Commerce Commission and its reasonableness ascertained and adjudicated.

**6. CARRIERS ☜39—CARRIAGE OF GOODS—EMBARGOES.**

Carriers by railroad have the power to lay embargoes for the proper conduct of their business.

**7. CARRIERS ☜38—OFFENSES—ACTION BY INTERSTATE COMMERCE COMMISSION.**

A prosecution against shippers charged with obtaining discriminations in violation of the Elkins Act, as amended by the Hepburn Act (Comp. St. 1916, § 8597), cannot be defeated on the theory that the Interstate Commerce Commission should first have determined whether the actions of the shippers constituted violation, because one court might hold they did and another they did not.

**8. CARRIERS ☜23—SUSPENSION OF INTERSTATE COMMERCE ACT—GOVERNMENT OPERATION OF RAILROADS.**

In view of the presidential proclamation of December 26, 1917, whereby the President, as a war measure, under the authority of Act Aug. 29, 1917, assumed control of the railway systems of the country, and in view of Federal Control Act March 21, 1918, *held*, that the operation of the Interstate Commerce Acts, including the Elkins Act (Comp. St. 1916, §§ 8563–8604), was not suspended.

**9. CARRIERS ☜23—SEIZURE OF RAILROADS—SUSPENSION OF INTERSTATE COMMERCE ACT.**

While Act Aug. 29, 1917, allowing the President in time of war to assume control of the railway systems, was passed pursuant to the war power of Congress, given by Const. art. 1, § 8, *held*, that a railroad embargo promulgated under presidential authority, though giving preference to war material, was nothing more than a regulation incident to the proper conduct of the business of railroads, and the control which the President had assumed.

**10. CARRIERS ☜38—OFFENSES—DISCRIMINATIONS.**

Where defendants by misrepresentation obtained transportation service despite an embargo laid after the President had assumed control of the railroads, *held* that, as the Elkins Act, etc., was not suspended, and defendants obtained a discrimination, prosecution could not be defeated on the theory that there was no statute making it criminal to fail to comply with the embargo regulation.

**11. CARRIERS ☜38 — OFFENSES — INDICTMENT — PROMULGATION OF REGULATIONS.**

An indictment charging that defendants, in violation of the Elkins Act (Comp. St. 1916, § 8597), obtained a discrimination by securing through misrepresentation transportation service, notwithstanding an embargo laid after the President, under Act Aug. 29, 1917, assumed control of railroads, *held* not defective, on theory that the President's assent to embargo was not alleged; it being obvious he must act through agents.

The Metropolitan Lumber Company and another, the Southern Lumber Company and another, the Franklin Lumber Company, the Boynton Lumber Company, Ira R. Crouse, and Perrine & Buckelew, Incorporated, were severally indicted for alleged violations of Act Feb. 19, 1903, c. 708, § 1, as amended by Act June 29, 1906, c. 3591. On demurrers to the indictments. Demurrers overruled.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

Charles F. Lynch, U. S. Atty., of Newark, N. J., and Andrew J. Steelman, Asst. U. S. Atty., of Jersey City, N. J.

Robert H. McCarter, of Newark, N. J., for defendant Crouse.

Osborne & Cornish, of Newark, N. J., for defendants Boynton Lumber Co. and Perrine & Buckelew, Inc.

Harrison P. Lindabury, of Newark, N. J., for defendants Southern Lumber Co., David Jacobson, and Franklin Lumber Co.

Edward P. Stout, of Jersey City, N. J., for defendants Metropolitan Lumber Co. and Jacob Jacobson.

HAIGHT, District Judge. As the indictments in these cases are in all material respects the same, as are also the questions which the demurrers to each raise (at least so far as the points relied upon at the argument are concerned), the demurrers were argued together, and the decision herein announced will apply to all of the cases. The indictments are based on alleged violations of section 1 of the Act of February 19, 1903, c. 708, 32 Stat. 847, commonly known as the Elkins Act, as the same was amended by the Act of June 29, 1906, c. 3591, § 2, 34 Stat. 587, commonly known as the Hepburn Act (8 U. S. Comp. St. 1916, § 8597). All are alike in form, and each contains several counts.

A summary of the first count of the indictment against the defendant Crouse will suffice to illustrate what all set forth. It alleges, in substance, that on January 24, 1918, the Pennsylvania Railroad Company was a common carrier, engaged in interstate commerce, and subject to the various acts to regulate commerce; that on that date, "under the authorization" of the Director General of Railroads, who had theretofore been appointed as such by the President, when the latter, on December 28, 1917, took possession of the railroad systems of the country, and "upon the recommendation of the Regional Director, said Pennsylvania Railroad Company," because of the extremely severe weather, particularly affecting the operation of railroads crossing the Allegheny Mountains, which then prevailed, laid an "embargo against the transportation of property, including, among other things, lumber not constituting war supplies specifically approved by the War Department of the United States," over certain of its railway routes, including the points mentioned in the indictment; that the defendant, who was engaged in "purchasing, shipping, and selling lumber" at Perth Amboy, in this district, on April 2, 1918, in order to deceive the Pennsylvania Railroad Company, and obtain transportation over its lines of a carload of lumber from the state of Virginia, where it was located, to Perth Amboy, in the state of New Jersey, notwithstanding the embargo, caused the lumber to be consigned to "Ira R. Crouse, in care of United States Government Quartermaster, Government Order A–1–1014 U. S. Property G–783–347 at Perth Amboy"; that he thereby caused the railroad company to believe that the lumber consisted of war supplies specifically approved by the War Department, and therefore that the transportation of it was not prohibited by the embargo, and to transport it accordingly, notwithstanding the embargo, although he knew that the lumber was not war supplies specifically

254 F.—22

approved by the War Department, or other property excepted from the operation of the embargo; that as consignee of the lumber, which was transported under the circumstances before mentioned, in time of war, and while the embargo was in force, he "did knowingly accept and receive from said Pennsylvania Railroad Company, a discrimination in respect to the transportation by said Pennsylvania Railroad Company of said property in interstate commerce, as aforesaid, whereby a discrimination was practiced in favor of said Ira R. Crouse, and against the United States· and all other shippers who desired to ship lumber and other commodities over said railway route of said Pennsylvania Railroad Company—among others" naming various concerns and individuals.

In five of the counts (this likewise applies to all of the indictments) he is charged under the same circumstances with having accepted and received "a concession in respect to the transportation" of lumber, "whereby an advantage was given to" him. Stated concisely, the charge is that the several defendants, by deceiving the railroad officials as to the character of the shipments, through the device·of having lumber fraudulently consigned to themselves in care of various army officers, or directly to the latter, procured its transportation in interstate commerce over the lines of the Pennsylvania Railroad Company, while the embargo was in force, and thus procured transportation service which the embargo forbade, and which in some instances others, desiring to ship over the same route of the said Pennsylvania Railroad Company, were unable to procure because of the existence of the embargo, thereby receiving discriminations or concessions in respect to the transportation of such property in interstate commerce.

The indictments are attacked on numerous grounds, all of which, however, are fairly embraced within the fundamental objections which will hereafter appear. As the acts complained of occurred after the President had taken control of the railroads of the country, pursuant to proclamation of December 26, 1917, the objections may be divided primarily into two classes: (1) Those which are claimed to exist irrespective of any effect which the President's act may have had on the Interstate Commerce Acts, and the duties and liabilities of the Pennsylvania Railroad and the defendants thereunder; and (2) those based upon changes alleged to have been effected thereby. I will first consider the grounds of demurrer which fall within the first of the before-mentioned classes. Hereinafter, when the Elkins Act is spoken of, it will be understood, unless the contrary is indicated, that that act as it was amended by the Hepburn Act is meant.

[1] 1. It is primarily contended that section 1 of the Elkins Act— the criminal provisions—does not embrace the granting or receipt of a discrimination or concession such as the indictments allege that the defendants received, a discrimination or concession in transportation service exclusively, but contemplates only discriminations or concessions which in some way affect transportation rates or charges. Although my attention has not been directed to any reported decision wherein this precise question has been directly decided, neither it, nor some kindred questions to be hereafter discussed, are difficult of

solution in the light of the development of the interstate commerce legislation and the objects which Congress had in enacting it. Section 2 of the original Act to Regulate Commerce of February 4, 1887, c. 104, 24 Stat. 379 (Comp. St. 1916, § 8564), provided that it should be unlawful for any common carrier to, directly or indirectly, receive a greater or less compensation for any service rendered in the transportation of passengers or property than it charged or received from any other person for doing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions. It will be noted that the section referred only to compensation. Section 3 (Comp. St. 1916, § 8565), however, prohibited the making or giving of "any undue or unreasonable preference or advantage" to any person, locality, or any particular description of traffic "in any respect whatsoever," and the subjecting of any such person, locality or kind of traffic "to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." The last section is broad enough to embrace a discrimination in the matter of transportation service, as distinguished from the compensation to be paid for such service, and so it has been construed. See Interstate Com. Com. v. Ill. Cent. R. R., 215 U. S. 452, 475, 30 Sup. Ct. 155, 54 L. Ed. 280. Section 6 (Comp. St. 1916, § 8569) forbade any carrier to charge or receive a greater or less compensation for transportation than the rates, fares and charges specified in the tariffs, which the act required to be filed and published. This section was extended, by the Hepburn Act, to forbid the granting of any privileges or facilities in transportation except such as were specified in such tariffs.

By section 10 (Comp. St. 1916, § 8574) a criminal liability was imposed upon any common carrier who should willfully do or cause to be done, or suffer or permit to be done, "any act, matter or thing in this act prohibited or declared to be unlawful, or who shall aid or abet therein," etc. By the same section, as amended by the Act of March 2, 1889, c. 382, § 2, 25 Stat. 855, it was made a criminal offense for a carrier "by means of false billing, false classification, false weighing or false report of weight, or by any other device or means," to knowingly and willfully assist or suffer or permit any person to obtain transportation for property "at less than the regular rates then established," on the line of transportation of such carrier. The same section, as amended by the act last mentioned, also provided that any one for whom, as "consignor or consignee," property should be carried by a common carrier, who should knowingly and willfully, "by false billing, false classification, false weighing, false representation of the contents of the package or the substance of the property, false report of weight, false statement, or by any other device or means, whether with or without the consent or connivance of the carrier," obtain or attempt to obtain transportation for such property "at less than the regular rates then established," should be guilty of a crime, as should likewise any person who should, "by payment of money or other thing of value, solicitation, or otherwise, induce or attempt to induce any common carrier * * * to discriminate unjustly in his,

its, or their favor as against any other consignor or consignee in the transportation of property."

It will thus be noted that, while the law made it unlawful and criminal for a carrier to give any unreasonable preference or advantage or to subject any person to an unreasonable prejudice or disadvantage in respect to transportation over its lines, and quite comprehensively prohibited and provided penalties for discrimination in the matter of compensation for transportation and from departing from the filed and published tariffs, it did not prohibit the receipt of discriminations in respect to transportation service, strictly speaking, by the shipper, nor make it criminal for him to accept transportation at a less compensation than was charged to others for a like service, or at less than the published tariffs, except when accomplished by false billing or bribery or something akin thereto, mentioned in section 10. In this condition of the law, the Elkins Act, which has been well described as "a 'catch-all' provision for any practice by either carrier or shipper which by any device whatever would tend to defeat the purpose of the law" (United States v. Vacuum Oil Co., 153 Fed. 604 [D. C. W. D. N. Y.]), was passed. The provision pertinent to these cases is as follows:

"It shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereof whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be guilty of a misdemeanor." Comp. St. 1916, § 8597.

The language used is sufficiently broad and comprehensive to embrace a discrimination in transportation service, as well as a discrimination in respect to rates. The purpose which Congress had in passing the various acts to regulate commerce has been often stated by the Supreme Court. For instance, Chief Justice White, in New Haven R. R. Co. v. Interstate Com. Com., 200 U. S. 361, 391, 26 Sup. Ct. 272, 277 (50 L. Ed. 515), expressed it as follows:

"It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, * * * and forbidding rebates, preferences and all other forms of undue discrimination. * * * If the public purpose which the statute was intended to accomplish be borne in mind, its meaning becomes, if possible, clearer. What was that purpose? It was to compel the carrier as a public agent to give equal treatment to all."

In Armour Packing Co. v. United States, 209 U. S. 56, 72, 28 Sup. Ct. 428, 432 (52 L. Ed. 681), Mr. Justice Day said:

"The Elkins Act proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike."

See, also, the remarks on page 80 of 209 U. S. (28 Sup. Ct. 428, 52 L. Ed. 681).

In Chicago, Indianapolis & Louisville Ry. Co. v. United States, 219 U. S. 487, 496, 31 Sup. Ct. 272, 274 (55 L. Ed. 305), Mr. Justice Harlan said:

"The legislative department intended that all who obtained transportation on interstate lines should be treated alike in the matter of rates, and that all who availed themselves of the services of the railway company (with certain specified exceptions) should be on a plane of equality."

And in Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, 478, 31 Sup. Ct. 265, 269 (55 L. Ed. 297, 34 L. R. A. [N. S.] 671), the same distinguished Justice said:

"But the purpose of Congress was to cut up by the roots every form of discrimination, favoritism and inequality."

In United States v. Union Stockyard, 226 U. S. 286, 307, 33 Sup. Ct. 83, 89 (57 L. Ed. 226), Mr. Justice Day, in referring to the previous decisions of the Supreme Court respecting the purpose of Congress in enacting these laws, said that it was "to require equal treatment of all shippers and to prohibit unjust discrimination in favor of any of them," and on page 309 of 226 U. S., on page 90 of 33 Sup. Ct. (57 L. Ed. 226), he said:

"It is the object of the Interstate Commerce Law and the Elkins Act to prevent favoritism by any means or device whatsoever and to prohibit practices which run counter to the purpose of the act to place all shippers upon equal terms."

Similar expressions in the reported cases could be multiplied, but it would serve no useful purpose to do so. Of course, as happens with almost every piece of remedial legislation, the accomplishment of the end sought was reached by degrees, as the practical operation of the act and the decisions of the courts developed deficiencies, and as one radical change resulted in a further step in advance. Finally in the development of the legislative object the Elkins Act was passed, which, by its language, seems to be all-embracing, and to cover the loopholes which the previous acts left open for discrimination and the exercise of favoritism. It also brought within the prohibition of the law many acts of the shipper which had not theretofore been criminal; thus making the law more effective to accomplish the object sought.

It needs no argument to demonstrate that there is fully as much room for the exercise of favoritism and resulting inequality in the granting or withholding of transportation service or facilities as there is in the matter of compensation to be paid for such service, for as was said by the Interstate Commerce Commission in the matter of The New England Investigation, 27 Interst. Com. Com'n R. 560, 616, "service is often of even greater importance than the rate itself." This is especially manifest when there exists an embargo, such as the indictments in these cases allege. Hence, bearing in mind that the purpose of Congress in passing the Elkins Act was to utterly eliminate every form or kind of discrimination, favoritism, and inequality, it is quite impossible to believe that when Congress used the broad and compre-

hensive language which it did, "whereby any other advantage is given or discrimination is practiced," it intended to cover only advantages or discriminations in the matter of rates or compensation for transportation service. If discrimination in rates was the only evil aimed at, why were the words above quoted added? Discrimination in respect to rates had been as completely covered as the English language is capable of, by the use of the words "whereby any such property shall by any device whatever be transported at a less rate," etc.

The purpose of Congress being ascertained, and it being apparent that to permit discriminations in transportation service would thwart that purpose, and the language·used in the act being amply sufficient to embrace such discriminations, it seems to me that the conclusion is irresistible that such a discrimination as is complained of in these indictments is within the criminal provisions of the Elkins Act. Indeed, although he was not passing upon the precise question here under discussion, Mr. Justice Day, in the Armour Packing Co. Case, supra, at page 74 of 209 U. S., at page 232 of 28 Sup. Ct. (52 L. Ed. 681), said:

"For the penal section is not only aimed at offenses whereby property is transported in interstate commerce at less than published rates, but in terms covers the offering, granting, giving, soliciting, accepting or receiving of rebates, concessions or discriminations, 'whereby any other advantage is given or discrimination is practiced' in respect of interstate transportation."

While the decisions which deal with the right of the government, through the instrumentality of the Interstate Commerce Commission or the courts, to restrain undue discrimination or preference in the matter of transportation facilities or service, such as Interstate Com. Com. v. Ill. Cent. R. R. Co., 215 U. S. 452, 30 Sup. Ct. 155, 54 L. Ed. 280, are not dispositive of the question under consideration, which has to do with the criminal provisions of the Elkins Act, they do illustrate the spirit in which the acts have been construed, and demonstrate that any practice which works a discrimination in respect to transportation service is within the general scope of the act. I cannot conceive, therefore,·that it can be successfully maintained that Congress, when it used the broad language found in the Elkins Act, did not intend to make it a penal offense to give or receive a discrimination or concession in respect to transportation service or facilities, without regard to whether the same in any way affects the rate or compensation to be paid therefor. This conclusion seems also to be in harmony with the views of Judge Mayer, as expressed in his decision in United States v. Lehigh Valley Ry. Co. et al. (D. C. S. D. N. Y.) 254 Fed. 332.

[2] 2. The allegations of the indictments forbid the possibility of drawing an inference that the discriminations or concessions which the defendants are alleged to have received were procured with the knowledge, acquiescence, or connivance of the carrier. It is defendants' contention that such knowledge, acquiescence, or connivance is essential before the acceptance or receipt of a discrimination or concession is criminal under the Elkins Act. While it is admitted that there is nothing in the act which specifically makes the knowledge or connivance of the shipper an essential element of the crime, yet it is argued that the words "to give or grant" are correlative with the words "to accept

or receive," and that a discrimination cannot be accepted or received unless it has been given or granted. That is, of course, true; but it by no means follows therefrom that a discrimination may not have been knowingly received by the shipper and unconsciously given or granted by the carrier.

Bearing in mind the purpose which Congress had in mind in enacting the Elkins Act, as before set forth, and considering, as will be hereafter shown, that a construction such as defendants urge would in many cases defeat that purpose, and further bearing in mind that one of the ways in which it was sought to eliminate all favoritism and inequality of treatment was by visiting criminal punishment on those who would be the beneficiaries thereof, it would be unjustifiable, I think, in the absence of language from which it can be clearly found, to attribute to Congress an intention to limit the operation of the act to only such transactions as are consciously participated in by both the shipper and the carrier. Such a construction would free from criminal responsibility both the carrier and the shipper in all those cases where the shipper could, without the knowledge of the carrier, secure advantages and discriminations in transportation service, by means which do not fall within the provisions of section 10 of the Act to Regulate Commerce, as it was amended by the Act of March 2, 1889, c. 382, § 2, 25 Stat. 855, and the Act of June 18, 1910, c. 309, § 10, 36 Stat. 539. The provisions of that section, except as to the acts interdicted in the last paragraph, deal only with the procuring of transportation at less than the established rates. The last paragraph seems clearly to deal only with cases in which the carrier knowingly participates, or in which an attempt is made to secure the discrimination by means which would acquaint the carrier with the object sought. The language of that paragraph is:

"If any * * * person * * * shall, by payment of money or other thing of value, solicitation, or otherwise, induce or attempt to induce"

—any carrier to discriminate in its favor. Under the settled rule of construction, the word "otherwise" should be construed to include offenses which are akin to those specifically mentioned; that is to say, bribery and solicitation, both of which would, of course, necessitate acquainting the carrier with the object sought to be accomplished. The use of the word "induce" would also seem to lead to the same conclusion. Hence, section 10, as amended and supplemented, would not cover cases such as these or many others which may be readily imagined. Moreover, if it was intended to cover, by section 1 of the Elkins Act, only the receipt of discriminations which are granted with the carrier's knowledge, that part of the act was quite unnecessary, because it was for all practical purposes already covered by the last paragraph of section 10 of the Act to Regulate Commerce. It was held by the Circuit Court of Appeals of the Sixth Circuit, in Nichols & Cox Lumber Co. v. United States, 212 Fed. 588, 590, 129 C. C. A. 124, that the amendment made to that section by the Act of June 18, 1910, did not repeal the Elkins Act, because they were aimed at different evils.

While the remarks of Mr. Justice Lurton in Mo., Kan. & Tex. Ry. Co. v. Harriman, 227 U. S. 657, 671, 33 Sup. Ct. 397, 57 L. Ed. 690 (second paragraph), are susceptible of the inference which the government seeks to draw from them, and, if interpreted in that light, would fully support the views here expressed, I am not, owing to the facts of that case, sufficiently persuaded that they may be properly considered as an expression of an opinion of the Supreme Court on the point in question. I incline to the belief that the court had reference rather to the fact that the acts therein referred to produced a discrimination which the Elkins Act prohibited, rather than that such acts were necessarily criminal under that statute. Nor do I think that the remarks of the same Justice in Kans. Southern Ry. v. Carl, 227 U. S. 639, 652, 33 Sup. Ct. 391, 57 L. Ed. 683 (referred to by counsel for one of the defendants), is susceptible of the meaning which it is sought to attribute to it. In speaking of connivance, the court did not refer to that as a fact necessary to bring the discrimination or preference within the "act of Congress," but rather referred to the effect of connivance of the carrier on the estoppel which underlay the decision of the case.

It is further urged that the views expressed by Judge Holt in United States v. N. Y. Cent. & H. R. R. Co., 146 Fed. 298, 303 (C. C. S. D. N. Y.), are opposed to those above expressed. It is true that Judge Holt said in that case:

"I think that the offense of giving or receiving rebates is such an act. It requires the concurrence of two persons. A rebate cannot be given unless there is some one who agrees to receive it and who does receive it, and cannot be received unless there is some one who agrees to give it and who does give it."

These remarks may be entirely correct so far as rebates are concerned (and they related only to rebates), because a rebate (a giving back) may very properly imply a consciousness on the part of the carrier of what it was doing. That may have been the reason for the amendment made to section 10 of the Act to Regulate Commerce by the Act of June 19, 1910, which prohibits the procuring of refunds by false statements and representations as to value, injury, etc., of property theretofore transported. But because it may be that the giving and acceptance of a rebate requires the conscious participation on the part of the carrier, it does not follow that every discrimination or concession must also require a like participation. My conclusion therefore is that the receipt of a discrimination or concession such as the indictments in this case allege that the defendants received, is made criminal by the provisions of the Elkins Act, irrespective of whether the carrier consciously and knowingly participated therein.

[3] 3. The next contention of defendants, in orderly sequence, is that the indictments do not allege any such discrimination as is contemplated by the Elkins Act, because they do not show that any other persons were denied the same transportation service as the defendants received. In other words, the objection is, as I understand it, that the indictments do not allege that any other persons, who caused lumber to be consigned in the fraudulent manner that the defendants

did, were denied like transportation facilities. The mere statement of the proposition would seem to be quite sufficient to refute its soundness. In its final analysis it is this: Because the indictments do not allege that others, desiring to avail themselves of transportation service while the embargo was in effect, did not attempt to or were unsuccessful in inducing the railroad company to believe that their particular shipments were within the exceptions of the embargo, when they were not, the indictments do not show that the defendants, who were successful in doing so, received a discrimination. But that, as I conceive it, is not the test; but it is whether the defendants received transportation of lumber which was not within one of the exceptions of the embargo, when others who desired like service could not procure it. In that view full effect can be given to the decision in United States v. Hanley, 71 Fed. 672, 673 (D. C. N. D. Ill.), and the indictments will still be good. They allege that there were others (who are named, including the United States) who desired to avail themselves of the transportation privilege which the defendants secured. The necessary effect of the allegations of the indictments is that such persons were denied what the defendants, by their fraudulent practices, procured. If that does not constitute the receipt of a discrimination, it is difficult to understand what does. This was the view entertained, I think, by the Circuit Court of Appeals of the Sixth Circuit in Hocking Valley Ry. Co. v. United States, 210 Fed. 735, 745, and 746, subdivision 8, 127 C. C. A. 285. At the conclusion of the part of the opinion just referred to Judge Denison pertinently said:

"It cannot be necessary that others should have known of the partiality and should have demanded equal treatment. Such concessions are naturally not made generally known."

Moreover, when the embargo was laid, every person desiring to avail himself of transportation facilities within the area of the embargo had a right to presume that it would be enforced. I do not think, therefore, that it would be necessary, in order to show the receipt of discriminations on the part of the defendants, that others had actually applied for transportation service similar to that which the defendants received, and had been denied it; it would be sufficient to show the promulgation of the embargo, the desire of the others to ship, the fact that they did not do so, or attempt to do so, by reason of the embargo, and the method by which the defendants procured transportation service in violation of the embargo. I think the remarks of Judge Hazel, in United States v. Vacuum Oil Co., 153 Fed. 598, 607 (D. C. W. D. N. Y.), support this view. The indictment in United States v. Hanley, supra, was framed under section 2 of the Act to Regulate Commerce, long before the Elkins Act was passed, and the objection was that it did not allege that the rebate which had been given to the defendant had been denied to others similarly situated. The fact that there were other shippers of lumber, who desired to avail themselves of transportation facilities while the embargo was in force, and who did not do so by reason of the embargo, coupled with the means by which the defendants did procure such service, readily distinguishes this case from the Hanley Case.

All that has just been said has reference to a discrimination, strictly speaking. Some of the counts of the indictment are based on the proposition that what the defendants received were discriminations, while others proceed on the theory that they were concessions. The fact that the indictment characterizes what the defendants did receive as "concessions" or "discriminations," as the case may be, does not make them such. What the defendants actually received, under all the facts and circumstances, will determine whether they were concessions or discriminations. While there undoubtedly is in some classes of cases a real distinction between a concession and a discrimination, there would seem to be no difference in a case where the act consists in conceding to one a transportation privilege which is denied to another because of a general rule or regulation. Whether the defendants in this case received a discrimination or a concession (a discrimination may readily include a concession) would seem to depend upon whether they secured something which others similarly situated could not, without regard to any general rule or regulation, or whether they received something more favorable than an established rule or regulation, such as the embargo, entitled them to, irrespective of whether others were denied the same concession or not. In either case what they did receive the Elkins Act forbade them to receive, and made their act in receiving it a criminal offense.

[4] 4. It is further urged that the indictments do not charge a crime, because the allegations thereof demonstrate that the defendants were not "shippers" within the meaning of the Elkins Act. I will assume, for the purpose of argument, that only "carriers" and "shippers" are within the provisions of section 1, as defendants forcibly contend. It is true that the indictments set forth that the defendants were "consignees" of the lumber which was transported in violation of the embargo; but they further allege that the respective defendants, for the purpose of obtaining transportation, caused the property to be fraudulently consigned, etc. Thus it appears that the defendants were the actors in the illegal transactions; and, so far as the indictments show, they were the persons to be benefited by the discriminations or concessions. The question then is: Were they, under such circumstances, "shippers," within the meaning of the act? I have no doubt that they were. To give to the word "shippers" the narrow meaning sought by defendants, and thus to hold that a consignee, when a different person than the consignor, could under no circumstances be a shipper, would, in many cases, defeat the main purpose of the act. For instance, very frequently the consignee, although he does not initiate the shipment, pays the freight, and the goods are in reality transported for him. Furthermore, in such cases he is the only person benefited by or interested in concessions or rebates. For obvious reasons, unless the very purpose of the act is to be nullified, such a consignee is a shipper, within the meaning of the act, as he is in fact.

That it was the intention of Congress that the criminal provisions of section 1 should reach consignees under such circumstances, is made more manifest when they are read in connection with the last paragraph of that section and section 10 of the Act to Regulate Com-

merce, and in the light of the purposes sought to be accomplished by the Elkins Act, as hereinbefore expressed. In the latter section, the obtaining of transportation, at less than the regular rates, by either the "consignor or consignee," through false billing, etc., is made a crime; and by the last paragraph of section 1 of the Elkins Act, "in addition to any penalty provided by" that act, a "consignor or consignee," "for whom" property is transported and to whom a rebate is given, is made liable to a forfeiture of three times the rebate. Bearing in mind the purpose which Congress had in passing the Elkins Act and the comprehensive language used, it cannot be that it was intended to punish the consignee only in cases falling directly within those provisions, and to leave him unscathed or without criminal responsibility in all other cases, which would undoubtedly constitute the majority. There is no conceivable reason for any such distinction and every reason to the contrary.

The context of the paragraph in which the words "whether carrier or shipper" are found must not be overlooked. "Every person or corporation, whether carrier or shipper," who knowingly gives, accepts, etc., are made thereby guilty of a crime. The use of the words "every person" would seem to indicate that Congress never intended to limit the application of that part of the act to only such shippers as occupy the position of consignors. Hence, without attempting to lay down any general rule applicable to all cases, I think that in a case such as these, where the consignees, as is alleged, exercised such direct control over the shipments as enabled them, by their own acts, to procure for themselves discriminations in respect to transportation service, they are clearly "shippers," within the meaning of the act. In such a case the transportation service is really rendered for them, not for the consignors, and they are in reality the shippers. The view above expressed finds direct support in the remarks of Judge Landis in United States v. Standard Oil Co. (D. C.) 148 Fed. 719, 722, and some support, I think, in that part of the opinion in United States v. Milwaukee Refrigerator Transit Co., 145 Fed. 1007, 1012 (C. C. E. D. Wis.), which deals with the defendant's contention that the Elkins Act touched only the carrier and the shipper, and not to the part of the opinion which construes the words "parties interested in the traffic," as it does also in the decision of the Interstate Commerce Commission in St. Louis Terminal Case, 34 Interst. Com. Com'n R. 453, 460, 461.

[5, 6] 5. It is further urged that the defendants cannot be prosecuted in the absence of proceedings before or previous action by the Interstate Commerce Commission. This proposition seems to be based on two theories. It is first claimed that the embargo should have been submitted to the Interstate Commerce Commission, and its reasonableness ascertained and adjudicated by that body. The obvious answer is that the reasonableness of the embargo is not in issue in these cases; but the question is whether the defendants have knowingly received a discrimination or concession in transportation service which a strict and impartial enforcement of the embargo would not have permitted them to receive. If the railroad company were being prosecuted for

having given, or the defendants for having received, discriminations by means of or through the embargo rather than by violating it, in all probability the defendants' contention would be well taken, for in such a case the question would be whether the embargo was reasonable, or whether it produced unjust and unreasonable discriminations among shippers. In that event an administrative question would probably be presented, which, under the decisions of the Supreme Court, must be passed on by the Interstate Commerce Commission prior to the institution of either civil or criminal proceedings. See Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Balt. & Ohio R. R. Co. v. Pitcairn Coal Co., 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292; United States v. Pacific & Arctic Co., 228 U. S. 87, 106, 33 Sup. Ct. 443, 57 L. Ed. 742; Penna. R. R. Co. v. International Coal Co., 230 U. S. 184, 196, 197, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315; Mitchell Coal Co. v. Penna. R. R. Co., 230 U. S. 247, 256, 257, 33 Sup. Ct. 916, 57 L. Ed. 1472.

In the cases at bar the defendants are charged, not with having secured discriminations through or by means of the embargo, but in violation of it; therefore, the reasonableness of the embargo is not in question. There would be nothing for the Interstate Commerce Commission, so far as any action on their part could affect the issues in this case, to pass upon. The distinction between the cases at bar and the supposed case is pointed out in Penna. R. R. Co. v. International Coal Co., supra, and in Mitchell Coal Co. v. Penna. R. R. Co., supra, where the two classes of cases are specifically dealt with, and particularly in Penna. R. R. Co. v. Puritan Coal Mining Co., 237 U. S. 121, 131, 35 Sup. Ct. 484, 59 L. Ed. 867, as it is also in Penna. R. R. Co. v. Stineman Coal Co., 242 U. S. 298, 37 Sup. Ct. 118, 61 L. Ed. 316, Penna. R. R. Co. v. Sonman Coal Co., 242 U. S. 121, 37 Sup Ct. 46, 61 L. Ed. 188, and Hocking Valley R. R. Co. v. United States, 210 Fed. 735, 745, 127 C. C. A. 285 (C. C. A. 6th Cir). The right of a carrier to lay embargoes for the proper conduct of its business is not, and I do not think could be successfully, contested. This right, wholly or partially, is recognized in nearly all of the cases last above cited, and especially in the decision of the Interstate Commerce Commission in Baltimore Chamber of Commerce v. Baltimore & Ohio Railroad, 45 Interst. Com. Com'n R. 40. If the defendants conceived that the embargo was unreasonable, or unjustly discriminatory, so far as they were concerned, they should have applied to the Interstate Commerce Commission for its vacation or modification, as was done in the case last cited, rather than to endeavor to evade it, and thus procure a discrimination over other shippers who were in the same class as themselves.

[7] It next seems to be contended that the Interstate Commerce Commission should first have determined whether the actions of the defendants constituted violations of the Elkins Act, because one court might hold that they did and another that they did not. This contention is based on an entire misapprehension of the doctrine above discussed. The proposition that the construction of a penal statute must

be first submitted to an administrative body before the courts can proceed to enforce it—and that is what defendants' contention amounts to—is so utterly without merit as to need no discussion.

[8, 9] 6. I am now brought to a consideration of such of the defendants' contentions as are based on the proposition that the act of the President in assuming control of the railway systems of the country, by virtue of that part of section 1 of the Act of August 29, 1917, c. 418, 39 Stat. 645, which authorized him to do so in time of war, suspended the operation of the Interstate Commerce Acts, including the Elkins Act, while such systems remained under his control. . When the expression "Interstate Commerce Acts" is hereinafter used, it will be understood as including the Elkins Act. It should be observed at the outset that the President's proclamation of December 26, 1917, specifically provided that:

"Until and except so far as said director [the Director General of Railroads] shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes and orders of the Interstate Commerce Commission"

—and that by section 10 of the subsequent Act of Congress of March 21, 1918, c. 25, commonly known as the Federal Control Act, it was provided:

"That carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President."

There was no express provision in the before-mentioned Act of August 29, 1917, repealing, suspending or providing for the suspension of any of the Interstate Commerce Acts; therefore, if that act did bring about or authorized any such suspension (which I do not attempt to decide), it would have to be implied from the fact that control by the President would be inconsistent with all or some of the provisions of the Interstate Commerce Acts. However, it is clear that the President did not consider that his control was thus inconsistent, because, as appears from the above-quoted extract from his proclamation, he specifically provided that the railroads should remain subject to all existing statutes and orders of the Interstate Commerce Commission until the Director General of Railroads should, by general or special order, otherwise provide. To the same effect is the subsequent Act of Congress of March 21, 1918. I do not think that it needs any argument to demonstrate that if the official to whom the law committed the possession and control of the railroads did not deem such possession and control, except as occasion might arise thereafter, so inconsistent with the Interstate Commerce Acts as to necessitate a suspension of them, that any court would be justified in holding to the contrary. Especially is that true when Congress by its later act, in effect gave the same interpretation, as I think it did, to its prior act. If it be assumed that the President could, by special or general order, under either of the Federal Control Acts, authorize discriminations in transportation serv-

ice, among persons similarly situated, of other than war material, supplies, and equipment, and other commodities essential to the prosecution of the war, no such order has been brought to my attention. Thus it follows that the provisions in question of the Elkins Act were not affected by the act of the President in assuming control of the railroads, and the unlawfulness of the discriminations alleged to have been received by the defendants was not removed thereby.

It may be readily conceded that the act, by virtue of which the President first assumed control, was passed pursuant to the "war power" of Congress (article 1, § 8, pars. 11, 12, 13, of the Constitution), as defendants contend; but that in no way affects these cases, because the provisions of the Interstate Commerce Acts, pertinent to them, were, at the time the offenses are alleged to have been committed, in full force and effect, as I have heretofore found. The embargo was not, as some of the counsel for the defendants seemed to assume, promulgated "under the war power of Congress." Even though it gave preference to war material and supplies, it was nothing more than a regulation incident to the proper conduct of the business of the railroads. The President had assumed control by virtue of an act passed under the war power of Congress; but the embargo was only an incident of the control, in the same sense that any embargo laid by a carrier, while a railroad was under its control, would be incidental to the proper conduct of its business.

[10] It is further contended that as there was no statute, when the embargo was promulgated, making it criminal to fail to comply with such "a regulation," the defendants' act in violating the embargo could not constitute a crime. This contention is based on the assumption that when the President took possession of the railroads, the Elkins Act was suspended. As I have heretofore found that there was no such suspension, it of course follows that the conclusion falls with the premise on which it is based. The crime charged is not that the defendants violated a regulation, but that they were recipients of discriminations which the Elkins Act forbade them to receive.

[11] It is also urged that the railroad officials were without authority to lay the embargo, because the railroad had passed under the control of the President, and that the Pennsylvania Railroad was thereafter, as a corporate entity, powerless to act either in respect to laying an embargo or in granting discriminations or concessions. Hence it is argued that the indictments are defective, because they allege that the discriminations were received from the "Pennsylvania Railroad," and because the embargo was laid by it, notwithstanding that they also allege that the embargo was authorized by the Director General. It was, of course, intended by Congress that the President should, in the performance of the duties imposed upon him by the Act of August 29, 1917, act through agents. In the proclamation of December 26, 1917, he provided that the Director General of Railroads should perform the duties imposed upon him (which were the duties imposed upon the President, after he had assumed control) "so long and to such extent as he shall determine, through the boards of directors, receivers, officers and employés of said systems of transportation." The embargo, therefore,

was laid through the agency which the President had created, and the discriminations or concessions were given or granted by those charged by him with the conducting of the Pennsylvania Railroad system of transportation, and that is what I construe the indictments to charge. They are entitled to receive a fair and reasonable construction.

7. I think that all of the objections to the indictment, which need more than a passing remark, are embraced within the points that have been discussed. There are one or two minor ones, of a very technical nature, which I think are deserving of no more discussion than that I have examined them and find them without merit.

My conclusion therefore is that the demurrers should be overruled.